COURT OF APPEALS OF VIRGINIA


Present:   Judges Benton, Elder and Beales
Argued at Alexandria, Virginia


YURI ISIDORO SASSON MOSCONA
                                                            OPINION BY
   v.  Record Nos. 1684-06-4 and                JUDGE JAMES W. BENTON, JR.
             3211-06-4                                    AUGUST 21, 2007

DANA SHENHAR


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Randy I. Bellows, Judge

Lawrence D. Diehl (Richard E. Crouch; John Crouch; Barnes &
Diehl; Crouch & Crouch, on briefs), for appellant.

Christopher B. Ashby (Stephen M. Sayers; Michael E. Kinney;
Hunton & Williams, LLP, on briefs), for appellee.


In a proceeding under the Hague Convention on Civil Aspects of International Child

Abduction (Hague Convention), Oct. 25, 1980, T.I.A.S. No. 11, 670, 19 I.L.M. 1501, as

implemented by the International Child Abduction Remedies Act (ICARA), 42 USC §§ 11601 to

11611, the trial judge ruled that Yuri Isidoro Sasson Moscona (Sasson) failed to prove (i) Dana

Shenhar, his wife, wrongfully removed or retained their child within the meaning of the Hague

Convention and (ii) Spain was the habitual residence of their child.  Sasson appeals from that

decision and, in a second appeal, also contests the trial judge's order for him to return the parties'

child to the United States, for him to pay attorney's fees, and finding him in contempt of court.

Because the two appeals involve related factual and legal issues, we consolidated them for

purposes of oral argument and decision.

Shenhar has responded to each of Sasson's issues and has moved to dismiss the appeals,

arguing, in part, that Sasson is a fugitive from justice in the context of these civil cases.  In light

of Sasson's refusal to recognize the authority of the Virginia judicial system and to comply with the trial judge's order, we hold he cannot seek relief from the same judicial system whose authority he evades, and we dismiss the appeals.

Background

These appeals arise from a dispute concerning the parties' only child. The following facts and circumstances are essentially undisputed. The father, Yuri Sasson, has Mexican citizenship. The mother, Dana Shenhar, has dual United States and Israeli citizenship. In 1997, prior to their marriage, Shenhar lived in the United States and Sasson moved to Florida while working for a French company. Following their marriage in Mexico on September 26, 1999, they lived in Florida for three years. Their son was born there on March 21, 2002; he is both a United States citizen and a Mexican citizen and has passports from both countries.

The family moved from Florida to Switzerland in July of 2002 to accommodate Sasson's promotion, and they lived there for two years. After Sasson's employment in Switzerland ended, he decided to open a business exporting Spanish wines to the United States. The family entered Spain in September of 2004 with tourist status. Sasson and Shenhar began to experience marital problems in Spain and separated in early July 2005. On October 22, 2005, Shenhar left Spain with the child and traveled to Fairfax, Virginia, where she lives with her parents.

In November 2005, Sasson filed a petition in the Fairfax Juvenile and Domestic Relations District Court under the Hague Convention to compel the child's return, petitioned for expedited enforcement of a registered foreign custody order, and filed an emergency motion for physical custody of the child to prevent removal. A day later, Shenhar filed a bill of complaint in the Circuit Court of Fairfax County for separate maintenance and custody. In this complaint, she asked the court to enjoin both parties from removing the child from the state. The circuit court

judge issued an *ex parte* order, granting Shenhar temporary custody of the child and issuing a *pendente lite* injunction against the removal of the child from the state and the country.

Shenhar also filed a special appearance objecting to the juvenile court's jurisdiction over the custody and visitation issues. The juvenile court granted a stay while the circuit court considered Shenhar's bill of complaint. After Sasson filed a motion in the circuit court to dismiss the custody case for lack of jurisdiction, the circuit court judge remanded to the juvenile court the "child custody litigation which is part of . . . the separate maintenance complaint." While the proceeding was pending in juvenile court, the parties signed an agreement governing temporary visitation rights with the child and providing "they will not remove [the child] from the United States pending this litigation." The juvenile court judge signed the agreement as an order.

After an evidentiary hearing, the juvenile court judge entered an order on January 24, 2006, finding that the child was a habitual resident of Spain, that the Spanish custody order had not been served on Shenhar prior to her removal of the child to the United States, that both parties had shared custody of the child while they lived in Spain, and that Shenhar wrongfully removed the child from Spain. The juvenile judge ordered Shenhar to return the child to Sasson and further ordered that "the child shall return to Spain in the care of the father immediately." Shenhar complied with the order, but appealed to the Circuit Court of Fairfax County, which conducted *de novo* proceedings as required by Code § 16.1-136.

At the *de novo* proceedings in circuit court, the parties gave conflicting accounts of their intentions and the events occurring in Spain. Their testimony was in dispute on many significant matters. At the conclusion of the evidentiary hearing, the trial judge issued a thirty-page opinion letter in which he found Shenhar's testimony to be more credible on most issues in dispute and ruled Sasson failed to prove (i) Shenhar wrongfully removed or retained their child and (ii) Spain

was the place where the child was a habitual resident. Under our established standard of review, we, therefore, recite the evidence in the light most favorable to Shenhar, who prevailed at trial. See Johnson v. Johnson, 26 Va. App. 135, 144, 493 S.E.2d 668, 672 (1997).

Shenhar testified that when the parties moved from Florida to Switzerland in 2002, it was their intention to return to the United States "within the next several years." After sixteen months in Switzerland, Sasson and his employer experienced difficulties and began negotiating a financial severance from his employment. Sasson and Shenhar remained in Switzerland for nine months pending settlement of this issue, and they discussed relocating. Sasson testified he wanted to start a wine brokerage business in Spain. Shenhar said they intended to be in Spain "a few months" to establish contacts for exporting wines to the United States and return to the United States, where Shenhar is a licensed veterinarian. The trial judge found, as Shenhar testified, that the parties discussed a temporary move to Spain that "was to last just long enough for Sasson to establish his business, at which point the family was to return to the United States." Indeed, the trial judge noted that Sasson began visiting a therapist two months after they arrived in Spain due to growing tension in their marriage, including "Shenhar's desire to return to the United States with the family."

The family arrived in Spain in September 2004 and initially lived with Sasson's parents, who also own a residence in the United States. Several months later, Sasson and Shenhar moved to an apartment. When they arrived in Spain, they enrolled the child, then two years old, in nursery school. As the trial judge noted, the marriage began to deteriorate.

After they entered Spain on tourist visas, Sasson paid an attorney to arrange for the family's permanent residency in Spain. Sasson testified he first met with an attorney in June 2004, before they entered Spain, for the purpose of applying for residency in Spain. Shenhar testified, however, she did not learn of Sasson's efforts to obtain Spanish residency on their

behalf until the summer of 2005. The trial judge credited Shenhar's testimony, found that Sasson hid these matters from Shenhar, and found these actions constituted "additional evidence that there was no agreement between the parties to make the move to Spain permanent." The trial judge found that despite the earlier discussions between the parties about returning to the United States, Sasson "secretly harbored the desire to move permanently to Spain."

Shenhar traveled to the United States in January of 2005 to attend a veterinary conference in order to keep her veterinary license current. When Shenhar returned to Spain, she and Sasson discussed his lack of success with the wine business, and she informed Sasson that she wanted to return to the United States with the child. According to Shenhar, Sasson assured her the business would succeed and said he needed more time. Sasson also told her: "I would use my last breath of fresh air, my last [drop] of [blood], my last penny, in order to avoid her taking my child away from me." The next morning, without Shenhar's knowledge, Sasson removed the child's United States passport, birth certificates, and social security documents from the safe in their apartment. Sasson testified he removed the documents specifically to prevent Shenhar from taking the child to the United States. In April 2005, Shenhar discovered the documents were missing.

The parties separated in June 2005. After their separation, Shenhar remained in the apartment they had shared, and Sasson moved to a nearby apartment. When the lease on her apartment expired, Shenhar moved to a motel with weekly rentals. Shenhar testified she could not legally work in Spain, did not speak Spanish, and only managed to meet her living expenses with financial help from her parents.

In July 2005, Sasson's attorney filed residency and work permit petitions for Sasson in Spain. Several days later, Sasson filed an *ex parte* petition in the Spanish court, seeking various remedies including establishing the child's domicile in Spain, preventing the removal of the child from Spain without Sasson's or judicial approval, and sending notices to consulates prohibiting

the issuance of passports to the child. Shenhar did not receive notice of any of the petitions. After other disputes between the parties, Shenhar went to the United States embassy, obtained a replacement passport for the child, and traveled with the child to Fairfax County, Virginia, where her parents reside. Sasson acknowledged that the order issued by the Spanish court was not served on Shenhar, but testified he told Shenhar about the order before she left Spain with the child. The trial judge credited Shenhar's testimony that Sasson did not inform her of the court order and that she felt "trapped" in Spain. The trial judge found that "[Shenhar's] stay in Spain between April and October was coerced" and that "[s]hort of abandoning her child, she was not free to leave."

In a lengthy opinion letter and accompanying order issued June 16, 2006, the trial judge made numerous factual findings, including the following:

> [T]he child was two years old when taken to Spain and three years old when removed from Spain . . . .
>
> . . . Sasson misled Shenhar regarding his true intentions. This Court found that the parties expressly agreed to make a temporary move to Spain so that Sasson could set up his business, at which time the family would return to the United States. Shenhar expected the trip to last a few months. This Court has also found, however, that Sasson secretly intended the move to Spain to be permanent . . . . This Court finds that what Sasson and Shenhar agreed upon expressly and explicitly — to wit, that the move to Spain was temporary and was to last only so long as it took for Sasson to set up his business, at which point the family would return to the United States — represents their shared parental intent.
>
> When Sasson removed and hid [the child's] passport, he engaged in an act of coercion against Shenhar and, through Shenhar, on [the child]. Specifically, he forced [the child] to remain in Spain against the will of his mother, a person who under Spanish law shared custodial rights, including, of course, the right to fix the child's place of residence. That coercion began on April 10, 2005, when Shenhar discovered that [the child's] passport had been hidden by Sasson, and ended on October 22, 2005, when Shenhar and [the child] returned to the United States. The two most immediate and direct impacts of this coercion is that it

extended [the child's] stay in Spain by more than six months, thereby giving Sasson an additional six months in which to establish that [the child] had become acclimatized to Spain, and also insuring that [the child] would be living in Spain at the time Sasson filed his petition in the Spanish courts for custody of [the child] in July 2005.

The trial judge ruled that, under the Hague Convention and ICARA, Sasson had the burden of proving, by a preponderance of the evidence, Shenhar had wrongfully removed or retained their child. He ruled Sasson could meet this burden by proving: "(1) that he held 'rights of custody' to [the child] under the laws of Spain; (2) that he was actually exercising those rights at the time of removal; and (3) that [the child] was 'habitually resident' in Spain immediately before he was removed by Shenhar to the United States." See Humphrey v. Humphrey, 434 F.3d 243, 246 (4th Cir. 2006). The trial judge found that the parties had equal rights of custody and that Sasson was exercising his rights of custody when Shenhar brought the child to the United States. Therefore, Sasson had proved (1) and (2) above. The trial judge also ruled, however, that "Sasson . . . failed to establish by a preponderance of the evidence that [the] child was 'habitually resident' in Spain immediately before he was removed to the United States."

The trial judge based this latter ruling on three factors. First, the parties did not have a shared parental intention to make Spain the family's home permanently, indefinitely, or even for a prolonged duration. Indeed, the judge found "that the shared intent of the parties was to make Spain a temporary residence before they returned to the United States" and that shared parental intentions "are enormously influential in determining whether a child [of age two] was in habitual residence." Second, the evidence failed to prove the child "became acclimatized in Spain or 'settled' in Spain." Citing thirteen facts and circumstances relating to the parties' status in Spain and intentions, the trial judge ruled that at two years of age the child's "life naturally revolved around his parents, not his surroundings." Third, the child was in Spain only six months when Sasson coerced the child and Shenhar to remain by taking and hiding the child's

- 7 -

passport. This conduct, the judge ruled, rendered the child's presence in Spain an "involuntary decision" for a substantial time of his presence in Spain. Consequently, the trial judge ruled that Sasson failed to prove the child was "habitually resident" in Spain and failed to prove Shenhar's conduct constituted "a wrongful removal or retention under Article 3 of the [Hague] Convention." See Mozes v. Mozes, 239 F.3d 1067 (9th Cir. 2001) (discussing the issue of "habitual residence"); Feder v. Evans-Feder, 63 F.3d 217 (3d Cir. 1995) (same); Ponath v. Ponath, 829 F. Supp. 363 (D. Utah 1993) (same).

On June 28, 2006, the trial judge issued three orders. One order expressly vacated the juvenile court's order and directed Sasson to return the child to the United States within fourteen days after which the judge would set a hearing "to take such further actions as may be warranted." Another order placed under advisement the issue whether to award fees and costs to Shenhar and directed the parties to submit briefs on whether he had the legal authority to do so. The third order set a briefing schedule for Sasson's motion to dismiss the custody case for lack of jurisdiction.

When Sasson failed to obey the order to return the child, the trial judge issued a rule to show cause regarding contempt. The trial judge also ruled that he had authority to award Shenhar attorneys' fees and costs expended on the Hague Convention determination. On September 15, 2006, the trial judge heard argument on Sasson's motion to dismiss the custody proceeding. The judge denied the motion as moot, ruling that what began as a separate custody case merged with the Hague Convention case and that the only remaining issues concerned the separate maintenance action.

The trial judge issued a second rule to show cause against Sasson on September 5, 2006, for not returning the child to the United States. A Spanish notary public attempted to serve process on Sasson, but, when Sasson did not answer his doorbell, the notary public delivered the

papers to the apartment building concierge. Sasson did not attend the October 12, 2006 hearing on the show cause. At the hearing, Sasson's counsel argued that service did not comply with Virginia's statute and additionally proffered that Sasson could not appear because the Spanish courts had sole possession of his passport. The trial judge ruled that he had jurisdiction because (1) service complied with Spanish law and Virginia law, (2) Sasson received actual notice, as gleaned from his attorney's appearance, and (3) Sasson's attorney waived the issue of service "by essentially . . . leap-frogging over the service issue and going to the merits" by explaining why Sasson did not appear. The trial judge found Sasson in contempt for not returning the child as ordered, issued a capias for his arrest, and fined him $1,000 a day for each additional day the child is not returned to this country.

Sasson asks this Court to reverse the orders of June 16, 2006, June 28, 2006, and October 12, 2006. In one appeal, he contends the trial judge erred in his application of the Hague Convention and ICARA by finding Sasson's removal of the child's passport and identification documents to be wrongful, in finding he coerced Shenhar's stay in Spain, by misapplying the test for habitual residence, and in giving undue weight to Shenhar's testimony. Sasson also appeals the trial judge's order requiring him to return the child to the United States, contending neither the Hague Convention nor ICARA gave the judge authority to order the child's return, to make a custody decision, or to exercise "implied powers." He also contends the Virginia court system did not have personal jurisdiction over him, he did not receive effective service to support a contempt ruling, and he did not waive his objection to service when his attorney made a special appearance at the hearing. Sasson further contends the circuit court judge had no power to award attorneys' fees to Shenhar. Last, Sasson contends that the circuit court judge erred by not dismissing Shenhar's child custody claim, which she filed pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act (Code §§ 20-146.1 through 20-146.38).

Shenhar contends the trial judge did not err in any of his rulings. Further, she requests this Court to dismiss the appeals because Sasson is a fugitive from justice as that concept applies in the civil context.

Motion to Dismiss

In her motion to dismiss these appeals, Shenhar argues that Sasson has deliberately refused to comply with the trial judge's order to return the child and that the trial judge has adjudged Sasson in contempt and has issued a capias for his arrest. Shenhar requests, therefore, that this Court apply the fugitive disentitlement doctrine and dismiss Sasson's appeals.

Sasson responds that the application of the doctrine in his case is inappropriate because he "finds himself in a position that no Hague Convention litigant, successful or unsuccessful, has ever found himself in before." He argues that he is "truly caught between the demands of two legal systems [in the United States and Spain]" and that the child was returned to Spain "after a thoroughly litigated trial by a . . . [juvenile court] judge . . . who happened to have been second-guessed by another judge four months later." Sasson further argues that the fugitive disentitlement doctrine is inappropriate for civil contempts and is not a part of Virginia statutory or case law.

Although Virginia's appellate courts have not yet had the occasion to address the fugitive disentitlement doctrine, the United States Supreme Court has noted that "it has been settled for well over a century that an appellate court may dismiss the appeal of a defendant who is a fugitive from justice during the pendency of his appeal." Ortega-Rodriguez v. United States, 507 U.S. 234, 239 (1993). Application of the doctrine "does not strip the case of its character as an adjudicable case or controversy, . . . [but] it disentitles the [appellant] to call upon the resources of the Court for determination of his claims." Molinaro v. New Jersey, 396 U.S. 365, 366 (1970); see also Ortega-Rodriguez, 507 U.S. at 234. In other words, "'a fugitive from justice

- 10 -

may not seek relief from the judicial system whose authority he or she evades.'" Matsumoto v. Matsumoto, 792 A.2d 1222, 1227 (N.J. 2002) (quoting Martha B. Stolley, Sword or Shield: Due Process and the Fugitive Disentitlement Doctrine, 87 J. Crim. L. & Criminology 751, 752 (1997)).

The fugitive disentitlement doctrine, although traditionally applied to criminal cases, extends to civil cases as well. See, e.g., Degen v. United States, 517 U.S. 820 (1996) (considering the doctrine in a civil forfeiture case); Empire Blue Cross & Blue Shield v. Finkelstein, 111 F.3d 278, 281 (2d Cir. 1997) (applying the doctrine in a civil RICO Act appeal). Indeed, numerous jurisdictions recognize the doctrine in the context of Hague Convention and other domestic cases. See, e.g., Pesin v. Rodriguez, 244 F.3d 1250, 1253 (11th Cir. 2001) (dismissing an ICARA appeal where the appellant had continuously refused to comply with court orders, had been found guilty of contempt, and had a warrant for her arrest); Prevot v. Prevot, 59 F.3d 556, 562-67 (6th Cir. 1995) (dismissing the appellant's Hague Convention appeal where he fled the country with his wife and child to avoid criminal charges and lived in France); Guerin v. Guerin, 993 P.2d 1256, 1258 (Nev. 2000) (dismissing the appeal under the doctrine "in light of [appellant]'s fugitive status and continued refusal to comply with the district court's orders" in a divorce case); Matsumoto, 792 A.2d at 1222 (considering the fugitive disentitlement doctrine in a domestic case); Scelba v. Scelba, 535 S.E.2d 668, 670-73 (S.C. Ct. App. 2000) (applying the fugitive disentitlement doctrine where the appellant did not comply with a court order and was held in contempt for her failure to appear at multiple hearings).

Courts applying this doctrine uniformly have held that "a fugitive from justice need not be a fugitive in a criminal matter." Finkelstein, 111 F.3d at 281; United States v. Barnette, 129 F.3d 1179, 1183 (11th Cir. 1997).

> The inquiry is not whether the order flouted is criminal or civil, or whether the case in which the doctrine is sought to be invoked is

criminal or civil. [Rather,] it is the flight or refusal to return in the face of judicial action that is the critical predicate to fugitive disentitlement.

Matsumoto, 792 A.2d at 1233. Indeed, "[u]nder certain circumstances the disentitlement doctrine may be even more applicable to civil than criminal cases: because a defendant-appellant's liberty is not at stake, less harm can come from the refusal to entertain the appeal." Barnette, 129 F.3d at 1183. Furthermore, although a litigant may qualify as a fugitive by fleeing the jurisdiction, a litigant may also, "while legally outside the jurisdiction, 'constructively flee by deciding not to return.'" Matsumoto, 792 A.2d at 1228 (quoting Barnette, 129 F.3d at 1184).

Several courts have explained the bases for disentitlement of access to an appellate court.

> The rationales for this doctrine include the difficulty of enforcement against one not willing to subject himself to the court's authority, the inequity of allowing that "fugitive" to use the resources of the courts only if the outcome is an aid to him, the need to avoid prejudice to the nonfugitive party, and the discouragement of flights from justice.

Barnette, 129 F.3d at 1183 (citing Molinaro, 396 U.S. at 366). The United States Court of Appeals for the Second Circuit has noted that disentitlement is appropriate when an appellant's fugitive status "impacts the very case on appeal," the record contains no indication the appellant will respond to a judgment except one favorable to him, the appellant's conduct will render the judgment unenforceable against him, and the application of the doctrine is the only means of minimizing prejudice to the appellee. Finkelstein, 111 F.3d at 282. Similarly, the Supreme Court of New Jersey has noted that the following standards are generally applied:

> [T]he party against whom the doctrine is to be invoked must be a fugitive in a civil or criminal proceeding; his or her fugitive status must have a significant connection to the issue with respect to which the doctrine is sought to be invoked; invocation of the doctrine must be necessary to enforce the judgment of the court or to avoid prejudice to the other party caused by the adversary's fugitive status; and invocation of the doctrine cannot be an excessive response.

- 12 -

<u>Matsumoto</u>, 792 A.2d at 1233 (citing <u>Degan</u>, 517 U.S. at 824-28).  "Enforceability concerns clearly animate [the] disentitlement doctrine . . . [and an appellant's absence] weighs heavily in favor of disentitlement."  <u>Finkelstein</u>, 111 F.3d at 282.

As a caveat, the United States Supreme Court has warned against too freely exercising the authority to dismiss a case under this doctrine:

> [T]he sanction of disentitlement is most severe and so could disserve the dignitary purposes for which it is invoked.  The dignity of a court derives from the respect accorded its judgments.  That respect is eroded, not enhanced, by too free a recourse to rules foreclosing consideration of claims on the merits.

<u>Degan</u>, 517 U.S. at 828.  To ensure this authority is exercised with appropriate moderation, courts have imposed rules limiting its application.  First, in order to dismiss an appellant's claim due to his or her fugitive status, a connection must exist between the litigant's fugitive status and the litigant's appeal.  <u>Ortega-Rodriguez</u>, 507 U.S. at 249.  Second, before implementing such a severe sanction, a court must ask "whether an alternative short of dismissal will render enforcement of the underlying judgment certain and remove the risk of prejudice to the fugitive's adversary."  <u>Matsumoto</u>, 792 A.2d at 1233.  Third, the doctrine does not apply where the relevant policy concerns are not at issue.  <u>See</u> <u>Degan</u>, 517 U.S. at 826-29 (holding that the district court could not dismiss Degan's claims contesting the government's civil forfeiture of his property based on his fugitive status in the separate criminal proceeding); <u>Ortega-Rodriguez</u>, 507 U.S. at 249 (holding that the appeals court could not dismiss a criminal appeal based upon the defendant's escape where he was recaptured before the appeal).  In short, an appellate court must exercise "discretion in determining whether to apply the doctrine, which is equitable rather than jurisdictional in nature."  <u>Jaffe v. Accredited Sur. & Cas. Co.</u>, 294 F.3d 584, 595 (4th Cir. 2002).

As we have noted, no Virginia appellate court has previously considered whether to apply the fugitive disentitlement doctrine.  It is well established in Virginia, however, "[t]hat in the

courts created by the Constitution, there is an inherent power of self-defence and self-preservation." Carter v. Commonwealth, 96 Va. 791, 816, 32 S.E. 780, 785 (1899). Indeed, the Supreme Court of Virginia has expressly held that "sanctions can be used to protect courts against those who would abuse the judicial process." Oxenham v. Johnson, 241 Va. 281, 286, 402 S.E.2d 1, 3 (1991).

In Switzer v. Switzer, 273 Va. 326, 641 S.E.2d 80 (2007), where this Court dismissed an appeal as a sanction for the appellant's "fail[ure] to pay a monetary sanction in another case," id. at 333, 641 S.E.2d at 84, the Supreme Court did not hold this Court lacked authority to dismiss the appeal, but, rather, held dismissal under those circumstances "was an unduly severe sanction and was not narrowly tailored to correct the problem presented." Id. As a standard, the Court ruled "the imposition of a particular sanction must be sufficient to deter [the offending] practices," id. at 331, 641 S.E.2d at 83, and the imposition of the sanction requires the exercise of judicial discretion. Id.

Based upon the great breadth of authority and acceptance of the fugitive disentitlement doctrine nationwide and the inherent powers of Virginia courts to protect the integrity of the judicial process, we accept the validity of the doctrine, and we hold this Court may apply it in appropriate circumstances. In so doing, we recognize that dismissal of an appeal is the "ultimate sanction" this Court can impose upon a litigant, that the doctrine must be invoked with restraint, and that dismissal should be ordered only upon application of sound discretion. See id.

In this case, the connection between Sasson's fugitive status and his appeals is direct and undeniable. Compare Degan, 517 U.S. at 829 (finding the appeals court erred in dismissing Degan's civil forfeiture case based on his status as a fugitive arising from a separate criminal prosecution), with Pesin, 244 F.3d at 1253 (dismissing an ICARA appeal where the appellant "repeatedly defied court orders and ignored contempt sanctions and has continued to evade

- 14 -

arrest" in the current proceeding). After Sasson received an unfavorable ruling on his Hague Convention petition, he refused to comply with the trial judge's order to return the child to Virginia. When he failed to appear at the hearing on his noncompliance, the trial judge found him in contempt of court and issued a capias for his arrest. Sasson has declined to submit to the authority of the Virginia courts and, instead, has remained in Spain with the child. Refusing to comply with the trial judge's orders, he now asks us to overturn those very same orders on appeal.

Furthermore, Sasson's conduct demonstrates he will submit to the judgments of the Virginia judicial system only if they are favorable to him. When he obtained a favorable ruling in the juvenile court, he acted upon it, but he now argues that the trial judge's ruling, which vacated that order in a *de novo* proceeding, amounts to "second guess[ing] by another judge." This reasoning flouts Virginia's *de novo* hearing procedure. See Code § 16.1-136; Fairfax County v. D.N., 29 Va. App. 400, 406, 512 S.E.2d 830, 832-33 (1999) (noting that "[a] trial *de novo* in the circuit court 'annuls the judgment of the [juvenile court] as completely as if there has been no previous trial'" and empowers the circuit court to render a decision "'not as a court of appeals, but as one exercising original jurisdiction'" (citations omitted)). Sasson's non-cooperativeness renders enforceability, at best, problematic, and at worst, impossible. See Finkelstein, 111 F.3d at 282 (finding "no reason to 'entertain the cause of one who will only respond to a judgment if it is favorable'"). No alternative short of dismissal will render any judgment certain and remove the prejudice to Shenhar. Compare Matsumoto, 792 A.2d at 1234-35 (imposing a less severe sanction than disentitlement to satisfy the parties' interests), with Finkelstein, 111 F.3d at 282 (holding that disentitlement was the only "remaining means of minimizing the prejudice to [appellee]"). By Sasson's continued disregard of the authority of

our court system, he signals his belief we are powerless to enforce any judgment of our Court adverse to him.

Dismissing Sasson's appeals furthers the goals of the fugitive disentitlement doctrine by discouraging flight from justice, encouraging compliance with court orders, and promoting the efficient, dignified operation of the courts. See Degan, 517 U.S. at 824; Jaffe, 294 F.3d at 596. Indeed, to allow Sasson's appeal to proceed would unfairly allow Sasson to use the appellate process when his continued disobedience of prior orders demonstrates his view that compliance with any orders unfavorable to him is optional. See Scelba, 535 S.E.2d at 673 (dismissing the appeal where, in light of appellant's continued disobedience of court orders, the court took "a dim view of the possibility that she will voluntarily return . . . or otherwise cooperate with any order she does not fancy"); see also Pesin, 244 F.3d at 1253 (stating "it would be inequitable to allow [the appellant] to use the resources of the courts only if the outcome is a benefit to her").

Neither Walsh v. Walsh, 221 F.3d 204 (1st Cir. 2000), nor Matsumoto, 792 A.2d 1222, persuades us that dismissing the appeals would be unfair to Sasson, although both cases declined to exercise the fugitive disentitlement doctrine. In Walsh, the family moved to Ireland when the father fled the United States after criminal charges were lodged against him for offenses against his neighbor. 221 F.3d at 208. The father filed a Hague Convention petition in Massachusetts after the mother returned to the United States with the children. Id. at 209-12. The Walsh court held the doctrine was "too severe a sanction in a case involving parental rights . . . particularly in the absence of any showing that the fugitive status has impaired the rights of the other parent." Id. at 216. In contrast to Walsh, Sasson's actions leading to his fugitive status directly impaired Shenhar's rights. Also, unlike Walsh, Sasson's behavior deprives Shenhar of full access to their child. Although the importance of Hague Convention proceedings is self-evident, to allow Sasson's appeals to proceed would prejudice Shenhar even further.

The New Jersey Supreme Court declined to apply the fugitive disentitlement doctrine in Matsumoto, concluding that the "full participation of both parents in the process" is necessary to adequately evaluate the child's best interest in custody cases. 792 A.2d at 1235. The court, however, did not place a blanket prohibition on using the doctrine in custody cases, noting, "[t]o be sure, . . . we would impose the doctrine in a case in which the fugitive parent has removed or hidden the child, thereby making enforcement improbable in the event of a decision unfavorable to the fugitive parent." Id. at 1236. Thus, not only did Matsumoto involve a custody determination and not a Hague Convention petition, but the court expressly advocated application of the doctrine where, as here, a parent's placement of the child renders "enforcement improbable in the event of a decision unfavorable to the fugitive parent." 792 A.2d at 1236; see also Finkelstein, 111 F.3d at 282 (stating that "[e]nforceability concerns . . . weigh[] heavily in favor of disentitlement").

We note as unavailing Sasson's argument that the fugitive disentitlement doctrine should not apply to him because he is appealing the capias from which his fugitive status stems. We do not discern any exception to the doctrine where a party ignores a contempt finding and a capias but seeks to appeal those very matters. See Ortega-Rodriguez, 507 U.S. at 239-42 (discussing various cases that applied the doctrine in a criminal context). Indeed, the posture of Sasson's case is the traditional context in which the doctrine arises. Pesin, 244 F.3d at 1252 (noting the appellant "had yet to comply with the district court's order," had absconded, and failed "to end her contumacious conduct or submit to the court's authority"). We see no meaningful difference between a case in which an absconding criminal defendant appeals his or her conviction and this case, in which Sasson has appealed the orders requiring him to return the child and finding him in contempt for failing to do so. See generally United States v. Oliveri, 190 F. Supp. 2d 933 (S.D. Tex. 2001) (applying the fugitive disentitlement doctrine to deny the defendant's motion to

dismiss the criminal indictment where the defendant argued the indictment was based upon an invalid subpoena).

For these reasons, we hold that Sasson may not seek appellate relief from this Court. Accordingly, we grant the motion to dismiss without considering the other issues raised by the parties.

<u>Dismissed.</u>