Present:  Hassell, C.J., Keenan, Koontz, Kinser, Lemons, and
Millette, JJ., and Russell, S.J.

YURI ISIDORO SASSON[1]

                                        OPINION BY
v.  Record No. 072193          JUSTICE LAWRENCE L. KOONTZ, JR.
                                        October 31, 2008
DANA SHENHAR

          FROM THE COURT OF APPEALS OF VIRGINIA


     Adopting and applying the Fugitive Disentitlement

Doctrine[2] for the first time in Virginia, the Court of Appeals

_____


     [1] In the Court of Appeals, the case was styled as <u>Yuri
Isidoro Sasson Moscona v. Dana Shenhar</u>.  Moscona is Sasson's
mother's maiden name, which, following the convention common
in Spanish-speaking countries, is appended to his given names
and paternal family name.  In the pleadings in the circuit
court, the style of the case was inconsistently rendered as
either <u>Sasson v. Shenhar</u> or <u>Moscona v. Shenhar</u>.  We have
adopted the style of the case as given in the notice of appeal
filed in the Court of Appeals, and in keeping with that style
we will refer to the appellant as "Sasson," but we will refer
to the Court of Appeals' decision as "<u>Moscona v. Shenhar</u>."

     [2] The "Fugitive Disentitlement Doctrine" is the term most
commonly used to describe a body of case law which developed
principally in the federal courts in the late nineteenth
century beginning with <u>Smith v. United States</u>, 94 U.S. 97
(1876).  <u>See generally</u> Mitchell Waldman, Annotation,
<u>Application of "Fugitive Disentitlement Doctrine" in Federal
Civil Actions</u>, 176 A.L.R. Fed. 333 (2002).  The doctrine,
however, did not find wide application until the 1970s when
the federal courts began to broaden its application, which
formerly had been mostly limited to criminal cases.  J. Eric
Smithburn, <u>The Fugitive Disentitlement Doctrine in Hague
Convention Proceedings: An Equitable Arrow in the Judicial
Quiver</u> in <u>Law, Legal Culture and Politics in the Twenty First
Century</u>, at 296 (Franz Steiner Verlag 2004).  Since that time,
the doctrine has found broad acceptance in many state

of Virginia dismissed two appeals filed by Yuri Isidoro Sasson Moscona challenging judgments of the Circuit Court of Fairfax County in an international child custody dispute and a contempt order arising from a petition for rule to show cause in that case. Moscona v. Shenhar, 50 Va. App. 238, 649 S.E.2d 191 (2007). In this Court, Sasson contends that the Court of Appeals erred in applying the doctrine to his appeals without first considering his assertions that the circuit court did not have personal jurisdiction over him and also lacked subject matter jurisdiction and, thus, that the court's orders were void ab initio.

Sasson maintains that because void orders are a nullity, his disobedience of those orders did not cause him to become a "fugitive" for purposes of applying the Fugitive Disentitlement Doctrine. Sasson further contends that even if the Court of Appeals correctly determined that he is a fugitive, the Court nonetheless abused its discretion in applying the Fugitive Disentitlement Doctrine in this case because dismissing his appeals without a consideration of the merits constitutes an impermissible denial of due process.

jurisdictions, being applied in both criminal and civil cases, including both domestic and international child custody cases. See generally id.

2

BACKGROUND

As the Court of Appeals noted at the outset of its opinion, the facts of this case "are essentially undisputed." Id. at 240-41, 649 S.E.2d at 192. We will recite here only those facts necessary to explain the context in which this appeal arises. Sasson was born in and is a citizen of the United Mexican States (hereinafter, "Mexico"). Dana Shenhar was born in and is a citizen of the State of Israel and is also a citizen of the United States of America. Sasson and Shenhar were married in a civil ceremony in Mexico on September 25, 1999 and subsequently had the marriage solemnized in a religious ceremony in Israel on October 14, 1999.

On November 14, 1999, the couple moved to the State of Florida where their only child, Ilan Samuel Sasson, was born on March 21, 2002. On June 4, 2002, a United States passport was issued in Ilan's name. In July 2002, the family relocated to Neuchâtel, Switzerland. On October 31, 2003, a Mexican passport was issued in Ilan's name. In September 2004, the family again relocated to Marbella, Spain, where Sasson's parents lived.

At the time the family relocated to Spain, the relationship between Sasson and Shenhar had become strained. In October 2004, without advising Shenhar and contrary to

3

their discussed intention that their residency in Spain would be temporary, Sasson took steps to arrange for permanent Spanish residency for himself and, through him, for Shenhar and Ilan.

In January 2005, Shenhar advised Sasson that she was determined to return to the United States and that she wanted to take Ilan with her. Sasson opposed any separation of the family, assuring Shenhar that once his efforts to establish a wine exporting business succeeded, the family would return to the United States. However, despite this assurance, Sasson immediately and without Shenhar's knowledge secreted Ilan's passports and other citizenship documents in order to prevent Shenhar from taking Ilan out of Spain.

In April 2005, Shenhar again expressed a desire to return to the United States and acquired airline tickets for herself and Ilan to that end. Shenhar then discovered that Sasson had taken Ilan's passports. Unwilling to abandon her child, Shenhar involuntarily remained in Spain. In June 2005, Sasson and Shenhar separated, and Shenhar retained physical custody of Ilan.

In July 2005, Sasson assisted Shenhar in obtaining a new Mexican passport for Ilan, which permitted her to travel with Ilan to Israel to visit her grandfather, but which expressly barred Ilan from entry into the United States. Later that

4

month, Sasson, who had continued his efforts to obtain permanent residence status in Spain, filed in a Spanish court a "Petition for the Adoption of Certain Temporary Measures Prior to Filing for Matrimonial Separation" in which, in effect, Sasson sought shared custody of Ilan with Shenhar, but with Sasson having physical custody. Sasson also sought an order from the Spanish court barring Shenhar from obtaining an unrestricted passport for Ilan.

Over the next several months, Sasson and Shenhar's relationship grew increasingly acrimonious. On October 13, 2005, Shenhar applied to the American consulate for a new passport for Ilan, alleging that Sasson had "stolen" Ilan's original United States passport. In an ex parte proceeding that same day, Sasson obtained an order from the Spanish court setting a hearing on his petition for a provisional separation and directing that Ilan "will not be able to leave the country without permission of both spouses, or without judicial authorization." Sasson did not inform Shenhar of this order, and she was never served with any form of process from the Spanish court. Shenhar was not aware of the court proceedings in Spain until they were revealed in a subsequent proceeding in Virginia.

Having obtained a new United States passport for Ilan, Shenhar left Spain with him on or about October 21, 2005,

taking up residence in Fairfax County where her parents resided. Shenhar did not advise Sasson of her intention to take Ilan to the United States and did so without his knowledge or authorization. On October 24, 2005, Sasson filed for divorce from Shenhar in a Spanish court. On the following day, Sasson filed a request for an order directing that Ilan be returned to Spain with the Spanish Ministry of Justice, the "Central Authority" which administers the Hague Convention of the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 98 (hereinafter, "Hague Convention") in Spain.

On November 8, 2005, Sasson, by counsel, filed a petition in the Fairfax County Juvenile and Domestic Relations District Court (hereinafter, "J&DR court") seeking Ilan's return to Spain under the International Child Abduction Remedies Act (ICARA), 42 U.S.C. § 11601, et seq. (2000 & Supp. V 2005), the implementing legislation for the Hague Convention in the United States ("Hague Convention petition"). Sasson also filed a petition pursuant to Code § 20-146.29 for enforcement of a custody order entered in the Spanish court and a motion pursuant to Code § 20-146.32 to permit him to take physical custody of Ilan until the other matters were resolved. All three petitions were docketed as a single action on the J&DR court's docket.

6

On November 9, 2005, Shenhar filed a bill of complaint for separate maintenance in the Circuit Court of Fairfax County. Concurrent with her bill of complaint, Shenhar filed an ex parte petition for custody of Ilan and sought an order prohibiting his removal from Virginia. The following day, the circuit court issued a pendente lite order granting Shenhar temporary legal and physical custody of Ilan and directing that the child not be removed from Virginia.

On November 14, 2005, the J&DR court entered an order setting a hearing on Sasson's petitions for November 21, 2005 and directing in the interim that Shenhar give physical custody of Ilan to Sasson or Sasson's parents, who evidently had come from Spain to Virginia, and further directing that Ilan was to remain in Virginia pending the hearing. Sasson arrived in the United States on November 15, 2005. On November 18, 2005, Shenhar entered a "special appearance" in the J&DR court, contesting its jurisdiction based upon her superseding petition for separate maintenance and custody in the circuit court. The J&DR court entered a stay of the proceedings on Sasson's petitions pending action by the circuit court on Shenhar's request for custody in that court.

Subsequently, the circuit court entered an order referring the issue of the custody of Ilan brought under Shenhar's bill of complaint for separate maintenance to the

7

J&DR court.  On January 18, 2006, the J&DR court was advised by the federal government that Sasson had applied to the United States Central Authority, the agency designated by ICARA to administer the Hague Convention in the United States under 42 U.S.C. § 11606, for an order returning Ilan to his custody.[3]  On January 24, 2006, the J&DR court entered an order pursuant to Sasson's Hague Convention petition ordering the return of Ilan to Sasson's custody and permitting Sasson to return to Spain with Ilan.  The J&DR court took no action on Sasson's other petitions or on the custody issue arising under Shenhar's separate maintenance complaint referred to it by the circuit court.

On January 27, 2006, Shenhar noted her appeal of the J&DR court's decision to the circuit court pursuant to Code § 16.1-296(A).  On May 8 and 9, 2006, the circuit court conducted an evidentiary hearing limited to the issue of whether Sasson was entitled to the relief sought under his Hague Convention

---

[3] The United States Central Authority functions only as an administrative agency, communicating with similar bodies in other signatory countries concerning court decisions on matters falling within the jurisdiction of the Hague Convention.  The Central Authority does not have the power to order the return of a child, which can only be ordered by a court, but can provide assistance to a parent seeking return of a child.  See 22 C.F.R. § 94.6 (2006).

petition.  Sasson's counsel participated fully in this hearing, acknowledging at the outset that Shenhar had a right to seek the appeal de novo.  Sasson was present at the hearing and testified.  The principal issue in dispute at this hearing was whether Ilan was a "habitual resident" of Spain as that term is defined in the Hague Convention, thus giving that country primary jurisdiction over the issue of Ilan's custody.[4]

On June 16, 2006, the circuit court issued an opinion letter that gave a thorough and authoritative review of the relevant facts and law.  As pertinent to the subsequent events that led to Sasson's appeal to the Court of Appeals, the court determined that Sasson had not met the burden placed upon him by the Hague Convention to establish that Ilan was "habitually resident" in Spain.  Accordingly, the court ruled that Sasson was not entitled to seek the return of Ilan to Spain on that basis.  By an order entered contemporaneously with the opinion letter, the court ruled that the J&DR court's order for return of Ilan to Spain was "vacated."  The court did not, however,

---

[4] Shenhar also contested Sasson's right of custody, asserting that the order of the Spanish court awarding him custody of Ilan was invalid.  The circuit court found, however, that under Spanish law Sasson held "rights of custody" as defined by the Hague Convention without the need to resort to the court order.

9

order physical custody of Ilan to be returned to Shenhar at that time.

On June 28, 2006, the circuit court conducted a hearing at the outset of which the trial judge, noting that Sasson had filed renewed motions relevant to the custody proceeding arising from Shenhar's petition for separate maintenance, clarified that the only issue before the court was the resolution of additional matters under the appeal of the J&DR court's judgment regarding Sasson's Hague Convention petition.[5] At that hearing, the court was made aware that Sasson and Ilan had returned to Spain. The court entered an order directing that Sasson "shall immediately return Ilan Samuel Sasson to the United States, not later than July 12, 2006."[6] Although this order expressly denoted that that it "is not a final

---

[5] On September 15, 2006, the circuit court heard argument on Sasson's motion to dismiss the custody proceeding arising from Shenhar's complaint for separate maintenance. At the conclusion of the hearing, the court denied the motion as moot, ruling that the custody case had merged with Sasson's Hague Convention petition case. We express no opinion on the merits of that ruling.

[6] The record does not clearly establish when Sasson and Ilan returned to Spain, though, as indicated above, Sasson was present for the hearing conducted on May 8 and May 9, 2006. However, it is not disputed that Ilan was in Spain in his father's physical custody when the circuit court entered the order directing that Ilan be returned to the United States.

order," on July 6, 2006 Sasson filed a notice of appeal contending that the June 16, 2006 and June 28, 2006 orders "did all things which could lawfully be done within the scope of this Hague Child Abduction Convention case" and, thus, the matter was ripe for appeal.

On July 24, 2006, Shenhar filed a petition seeking a rule to show cause against Sasson, alleging that he had failed to obey the June 28, 2006 order to return Ilan to the United States. On July 26, 2006, the circuit court issued a rule to show cause requiring Sasson to appear on September 1, 2006 to answer the allegations of Shenhar's petition. On August 28, 2006, the court continued the hearing on the rule to show cause to October 12, 2006 on Shenhar's motion in order to attempt to obtain personal service on Sasson in Spain after his Virginia counsel had "declined to accept personal service on behalf of his client."[7]

The circuit court issued a second rule to show cause against Sasson on September 5, 2006. A Spanish notary public

---

[7] During this time, however, Sasson's counsel continued to appear before the circuit court by brief and in person to contest Shenhar's claim for attorney's fees and to address a challenge to the continuing jurisdiction of the court over such matters following the filing of the notice of appeal. Sasson's counsel asserted, however, that he was "appearing specially."

attempted to serve process on Sasson, but, when Sasson did not come to his door, the notary public delivered the papers to the concierge of Sasson's apartment building.

Sasson did not attend the October 12, 2006 hearing on the rule to show cause. At the hearing, Sasson's counsel contended that the service on the concierge did not comply with Virginia law and additionally proffered that Sasson could not appear because the Spanish courts had possession of his passport under a Hague Convention proceeding in that country. The circuit court ruled that the service of the rule to show cause comported with both Virginia and Spanish law. In an order dated October 17, 2006, the court found Sasson in contempt for not returning Ilan to the United States as ordered, issued a capias for his arrest, and imposed a fine of $1,000 a day for each additional day Ilan was not returned to this country.

On October 20, 2006, Sasson filed a motion for reconsideration of the finding of contempt, asserting that the circuit court lacked the authority under the Hague Convention to enter the June 28, 2006 order and, thus, erred in finding that Sasson was in contempt of that order. The court denied Sasson's motion. On November 13, 2006, Sasson filed a notice of appeal of the October 17, 2006 contempt order, asserting therein that he was also seeking to appeal the June 16, 2006

order denying his Hague Convention petition and the June 28, 2006 order directing him to return Ilan to the United States.

On December 1, 2006, Shenhar filed a motion to dismiss Sasson's appeal in the Court of Appeals.[8]  As relevant to the issues ultimately addressed by the Court, Shenhar contended that the Court should not hear the appeal because Sasson was a fugitive based upon his disobedience of the circuit court's order directing him to return Ilan to the United States and the subsequent finding of contempt.  Sasson filed a response to Shenhar's motion to dismiss asserting, relevant to her argument that the Court should dismiss his appeal because he was a fugitive, that the circuit court had lacked authority under the Hague Convention to enter the June 28, 2006 order and, thus, as he had argued in the circuit court, that he could not be in contempt of an order that was beyond the power of the court to enforce.

After the appeals were fully briefed and argued,[9] the Court of Appeals issued an opinion limited to addressing

_____

[8] Shenhar had previously filed a motion to dismiss on November 3, 2006 addressed only to the appeal arising from the notice of appeal filed following the entry of the June 28, 2006 order.

[9] The parties filed separate briefs on the merits of each appeal arising from the two notices of appeal filed by Sasson;

Shenhar's assertion that Sasson's disobedience of the July 28, 2006 order and his subsequent failure to appear in response to the rule to show cause permitted the Court to refuse to allow him to "seek relief from the same judicial system whose authority he evades." Moscona, 50 Va. App. at 240, 649 S.E.2d at 192. The Court first noted that Virginia's appellate courts had not yet adopted the Fugitive Disentitlement Doctrine in any prior case, but, after extensively recounting the development of that doctrine, the Court "accept[ed] the validity of the doctrine" and held that it could be applied "in appropriate circumstances." Id. at 253, 649 S.E.2d at 198. Finding that "the connection between Sasson's fugitive status and his appeals is direct and undeniable," id., the Court of Appeals held that "[d]ismissing Sasson's appeals furthers the goals of the fugitive disentitlement doctrine by discouraging flight from justice, encouraging compliance with court orders, and promoting the efficient, dignified operation of the courts." Id. at 254, 649 S.E.2d at 199. We awarded Sasson this appeal from the judgment of the Court of Appeals.

---

however, the Court of Appeals consolidated the appeals for oral argument and rendered a single opinion. Moscona, 50 Va. App. at 240, 649 S.E.2d at 192.

14

DISCUSSION

We begin our discussion by noting that Sasson does not directly challenge the determination of the Court of Appeals that the Fugitive Disentitlement Doctrine may be applied in Virginia in an appropriate case. Although this Court has not previously been presented with a case in which it was asserted that a litigant's status as a fugitive should bar him from bringing his appeal, we agree with the Court of Appeals that the doctrine has attained wide acceptance such that " 'it has been settled for well over a century that an appellate court may dismiss the appeal of a defendant who is a fugitive from justice during the pendency of his appeal.' " Moscona, 50 Va. App. at 249, 649 S.E.2d at 196 (quoting Ortega-Rodriguez v. United States, 507 U.S. 234, 239 (1993)). Moreover, as the Court of Appeals recognized, we have consistently held that " 'sanctions can be used to protect courts against those who would abuse the judicial process.' " Id. at 253, 649 S.E.2d at 198 (quoting Oxenham v. Johnson, 241 Va. 281, 286, 402 S.E.2d 1, 3 (1991)).

Accordingly, we hold that the Fugitive Disentitlement Doctrine may be applied in appropriate cases whenever a court of this Commonwealth in the exercise of sound judicial discretion deems it necessary to protect the dignity and power of the court from abuse by a litigant. It is not necessary to

15

repeat here the lengthy and authoritative discussion of the doctrine's development and application found in the Court of Appeals' opinion.  Id. at 249-53, 649 S.E.2d at 196-98. However, we will summarize the essential elements of the considerations a court must undertake before imposing the severe sanction of denying a litigant access to the court. Cf. Switzer v. Switzer, 273 Va. 326, 333-34, 641 S.E.2d 80, 84 (2007) (holding that the Court of Appeals erred in dismissing an appeal brought by a litigant on the ground that he had not paid a sanction imposed in a prior, unrelated appeal); see also Matsumoto v. Matsumoto, 792 A.2d 1222, 1233 (N.J. 2002) (holding in a Hague Convention case that "[w]hat is crucial is the inquiry into whether an alternative short of dismissal will render enforcement of the underlying judgment certain and remove the risk of prejudice to the fugitive's adversary").

In order to ensure that a dismissal of an appeal is imposed only in those cases where no lesser sanction or remedy is available, courts generally use a three-part test to determine whether the Fugitive Disentitlement Doctrine should be applied to bar an appeal.  In order to employ the doctrine, the following elements are required: (1) the appellant must be a fugitive, (2) there must be a nexus between the current appeal and the appellant's status as a fugitive, and (3) dismissal must be necessary to effectuate the policy concerns

16

underlying the doctrine.  See, e.g., Walsh v. Walsh, 221 F.3d 204, 215 (1st Cir. 2000); Magluta v. Samples, 162 F.3d 662, 664 (11th Cir. 1998); Atkinson v. Taylor, 277 F. Supp. 2d 382, 385 (D. Del. 2003).  Moreover, when deciding to apply the doctrine, courts must exercise "restraint," and its use must "be a reasonable response to the problems and needs that provoke it."  Degen v. United States, 517 U.S. 820, 823–24 (1996).  We agree with these principles and, accordingly, approve their application in this Commonwealth.

Guided by these principles, we now turn to address Sasson's contention that the Court of Appeals erred in finding that he is a "fugitive" under the first part of the three-part test for applying the Fugitive Disentitlement Doctrine. Sasson contends that, before finding that he is a fugitive, the Court of Appeals initially should have considered his assertion that the circuit court did not have jurisdiction under the Hague Convention and ICARA to order the return of Ilan from Spain to the United States.  Sasson contends that this is so because he could not be a fugitive from what he characterizes as a void order, nor could his failure to appear at the show cause hearing cause him to become a fugitive, since there is no contempt in the disobedience of a void order.  In effect, Sasson is asserting that the Court of Appeals could not find that he was a fugitive without first

17

considering the merits of his claim that the circuit court's order was void and, thus, that his disobedience of that order was justifiable. Because we disagree with Sasson's premise that a potentially void order need not be obeyed, we also disagree with his contention that the Court of Appeals could not find that he was a fugitive without first determining whether the June 28, 2006 order was in fact legally void.

" 'It is, of course, well settled that disobedience of, or resistance to a void order, judgment, or decree is not contempt.' " Leisge v. Leisge, 224 Va. 303, 306, 296 S.E.2d 538, 540 (1982) (quoting Robertson v. Commonwealth, 181 Va. 520, 536, 25 S.E.2d 352, 358 (1943)). This does not mean, however, that a party cannot become a fugitive as a result of the unilateral decision to disobey an order the party asserts to be void. To the contrary, "an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings." Local 333B, United Marine Div. of Int'l Longshoremen's Ass'n v. Commonwealth, 193 Va. 773, 783-84, 71 S.E.2d 159, 165-66 (1952) (quoting United States v. United Mine Workers, 330 U.S. 258, 293 (1947)). "A dissatisfied litigant should challenge the correctness of an adverse judgment or ruling by an appeal and not by disobedience of such order or by interfering with or obstructing the judicial

processes." Potts v. Commonwealth, 184 Va. 855, 861, 36 S.E.2d 529, 531 (1946); accord Leisge, 244 Va. at 307 n.2, 296 S.E.2d 540 n.2; Robertson, 181 Va. at 537-38, 25 S.E.2d at 359.

In Leisge, under facts somewhat analogous to the circumstances of this case, we acknowledged the principle that even where a party maintains that an order of a court is void, the appropriate action to take is to appeal that order, or to attack it in a collateral proceeding, while still submitting to the court's jurisdiction. Leisge, 244 Va. at 306, 296 S.E.2d at 540. Thus, in Leisge we upheld a finding of contempt against a father who had, in disobedience of a court order, refused to return a child to Virginia from another state and instead instituted custody proceedings in that state. On appeal, the father contended that he could not be held in contempt of the order to return the child to Virginia because the circuit court had not afforded him due process in the original proceeding in which custody was awarded to the mother and, thus, the subsequent order was void. We held that because the father had appealed the original custody order and that order had been affirmed, he was foreclosed from relitigating the validity of the order. Id. at 306-07, 296 S.E.2d at 540.

19

The record in this case is undeniably clear that Sasson, through his counsel, elected to bring his Hague Convention petition in the J&DR court while being fully cognizant that any final judgment of that court in his favor would be subject to Shenhar's right to an appeal de novo to the circuit court.[10]

---

[10] Although the Court of Appeals referenced Code § 16.1-136, see 50 Va. App. at 254, 649 S.E.2d at 199, which expressly provides for appeals to be heard de novo in cases originally decided in the general district courts, appeals from the J&DR courts are governed by Code § 16.1-296. In Walker v. Department of Public Welfare, 223 Va. 557, 562-63, 290 S.E.2d 887, 890 (1982), we held that appeals brought under Code § 16.1-296 are to be heard de novo in the circuit court. When we decided Walker, Code § 16.1-296 provided that appeals from a final judgment of the J&DR courts were to be "taken in accordance with the provisions of Chapter 7 (§ 16.1-123 et seq.) of Title 16.1." 223 Va. at 562-63, 290 S.E.2d at 890. In 1993, the General Assembly amended Code § 16.1-296, eliminating the cross-reference to Chapter 7 of Title 16.1. 1993 Va. Acts ch. 970. Nonetheless, the Virginia appellate courts have continued to recognize that appeals from the J&DR courts are to be heard de novo in the circuit courts. See, e.g., Lynchburg Div. of Soc. Servs. v. Cook, 276 Va. 465, 473, 666 S.E.2d 361, 364 (2008)(custody); Williams v. Williams, 256 Va. 19, 30 n.2, 501 S.E.2d 417, 423 n.2 (1998) (visitation); Fairfax County Dep't. of Family Servs. v. D.N., 29 Va. App. 400, 406, 512 S.E.2d 830, 832-33 (1999). The traditional form of appellate review in these cases has long been a de novo circuit court review of J&DR court proceedings. See Judicial Council of Virginia, Report to the General Assembly and the Supreme Court of Virginia: Adjudication of Family Law Matters 16 (1985) (de novo appeal process for review of decisions of the J&DR court had existed for "more than a third of a century" as of 1985). Accordingly, except as altered by the provisions of Code § 16.1-298 regarding the status of the judgment of the J&DR court upon the filing of a petition or during the pendency of an appeal, we are of opinion that the appeal is to be heard de novo in the circuit court.

Code § 16.1-296(A), in pertinent part, provides that: "From any final . . . judgment of the juvenile court affecting the rights or interests of any person coming within its jurisdiction, an appeal may be taken within 10 days from the entry of a final judgment." We recognize that, absent an order of stay being entered, Shenhar's appeal of the J&DR court's judgment transferring custody of Ilan to Sasson did not result in that judgment being suspended during the pendency of her appeal in the circuit court. See Code § 16.1-298. Nonetheless, to accept the assertion that because the judgment of the J&DR court remained in effect during the pendency of Shenhar's appeal, Sasson could leave Virginia with Ilan and thereafter refuse to recognize the continuing jurisdiction of Virginia's courts over the case, would be inconsistent with and effectively defeat the appeal of right afforded by Code § 16.1-296.

Although the record does not disclose the exact date on which Sasson and Ilan returned to Spain, it is irrelevant whether that event occurred during the three-day period between the J&DR court's judgment being rendered and Shenhar's noting her appeal or afterward. Sasson was aware that the judgment of the J&DR court was subject to being appealed for up to 10 days following its entry, that such an appeal would result in a new proceeding on his Hague Convention petition,

and that the result of that proceeding might differ from that arrived at in the J&DR court. Accordingly, when Sasson elected to return Ilan to Spain, his reliance on the J&DR court's judgment as a final disposition of his Hague Convention petition was not justified.

Shenhar's appeal brought both the parties and the subject matter of the case properly before the circuit court. Sasson's decision to physically remove Ilan from Virginia could not, and did not, divest the circuit court of jurisdiction over the case or over Sasson. Thus, while we will express no opinion on the issue, even if we were to agree with Sasson that the circuit court subsequently exceeded its jurisdiction by ordering him to return Ilan from Spain to the United States, Sasson's recourse was to seek an appeal of that decision on that ground. Moreover, the record in this case is clear that Sasson submitted to the jurisdiction of the courts of the Commonwealth and made repeated submissions, has disobeyed orders of these courts when the rulings were adverse to him, has expressly been held in contempt, was given time to comply, and thereafter process for his arrest has been issued. He has neither surrendered nor complied with the various orders, and thus remains a fugitive in every sense required in the particular context of this litigation. For these reasons, we hold that the Court of Appeals did not err in holding,

22

without consideration of Sasson's assertion that the June 28, 2006 order was void ab initio, that Sasson's status as a fugitive was sufficiently established in this case for purposes of applying the Fugitive Disentitlement Doctrine.

We turn now to consider Sasson's assertion that even if the Court of Appeals did not err in concluding that he was a fugitive, the Court nonetheless erred in holding that the Fugitive Disentitlement Doctrine should be applied in this case. Essentially, Sasson contends that the denial of his due process right to have the merits of the circuit court's judgment reviewed would interfere with his fundamental interest as a parent in the custody of his child and, thus, the sanction of denying him that right by application of the doctrine is too severe to warrant its application in such case. We disagree.

Sasson's contention that the doctrine ought not be applied in this case because its application denies him the right to have his appeals considered on the merits is nothing more than an assertion that the Court of Appeals erred in holding that this was an appropriate case in which to apply the doctrine. We review the judgment of the Court of Appeals to apply the doctrine in this case by determining whether the criteria for its application have been met, and we do so under

an abuse of discretion standard.  See, e.g., Bagwell v. Dretke, 376 F.3d 408, 413 (5th Cir. 2004).

We have already demonstrated that Sasson is a fugitive, thus satisfying the first part of the test for applying the doctrine.  We next consider whether there is a sufficient nexus between the issues raised in Sasson's appeal in the Court of Appeals and his status as a fugitive to warrant application of the doctrine.

As the Court of Appeals noted, in Walsh, for example, the United States Court of Appeals for the First Circuit declined to apply the Fugitive Disentitlement Doctrine in a Hague Convention case where there was no impairment of the other party's parental rights by the appellant's fugitive status and, thus, there was an insufficient nexus to satisfy the second part of the test for applying the doctrine.  Moscona, 50 Va. App. at 255, 649 S.E.2d at 199 (quoting Walsh, 221 F.3d at 216).  In this case, by wrongfully taking Ilan to Spain, Sasson has clearly interfered with Shenhar's parental rights.[11]  Thus, there can be no question that there is a sufficient

_____

[11] Even to the extent that the record might show that Shenhar has been able to visit Ilan in Spain, as Sasson contends, nothing in the record supports a conclusion that she is able to return with him to the United States without Sasson's consent.

24

nexus between Sasson's status as a fugitive and the issues he sought to have reviewed in the Court of Appeals.

Finally, the record amply supports the Court of Appeals' determination that Sasson is unwilling to submit to the jurisdiction of Virginia's courts unless he receives a judgment in his favor. Under such circumstances, the policy concerns underlying the doctrine warrant its application in this case because, as the Court of Appeals found, "[d]ismissing Sasson's appeals furthers the goals of the fugitive disentitlement doctrine by discouraging flight from justice, encouraging compliance with court orders, and promoting the efficient, dignified operation of the courts." Id. (citing Degen, 517 U.S. at 824; Jaffe v. Accredited Sur. & Cas. Co., 294 F.3d 584, 596 (4th Cir. 2002)). Accordingly, we cannot say that the Court of Appeals abused its discretion in determining that Sasson had forfeited his right to appeal the judgments of the circuit court by willfully becoming a fugitive.

CONCLUSION

For these reasons, we will affirm the judgment of the Court of Appeals dismissing Sasson's appeals in that Court with prejudice.

Affirmed.

25