COURT OF APPEALS OF VIRGINIA

Present:   Judges Elder, Beales and Powell
Argued at Alexandria, Virginia


TANYA LYNN PRASHAD

v.        Record No. 2609-08-4

ROBERTO-LUIS MANUEL COPELAND AND
  PHILIP BYRON SPIVEY

OPINION BY
JUDGE CLEO E. POWELL
NOVEMBER 24, 2009

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Bruce D. White, Judge

Catherine M. Bowers; Brett D. Lucas (Walker Jones P.C.; Gabriel
& Associates P.C., on briefs), for appellant.

Gregory R. Nevins (Rebecca Glenberg; Laurie E. Forbes;
Margo B. Owen; Lambda Legal Defense & Education Fund, Inc.;
American Civil Liberties Union of Virginia Foundation, Inc.; Law
Office of Laurie Forbes, LLC, on brief), for appellees.


Tanya Lynn Prashad ("Prashad") appeals the registration of the entirety of four custody and

visitation orders from the Gaston County, North Carolina Court of General Justice adjudicating

custody and visitation over A.C.C., a minor child, as between Prashad, Roberto-Luis Manuel

Copeland ("Copeland") and Philip Byron Spivey ("Spivey").  Specifically, Prashad argues that the

portions of the orders pertaining to Copeland violate Virginia's Marriage Amendment, Va. Const.

art. I, § 5A, and Marriage Affirmation Act, Code § 20-45.3, and therefore should have been

excluded.

BACKGROUND

On September 20, 2003, Prashad, Copeland, and Spivey entered into a surrogacy

agreement in Minnesota.  Prashad was artificially inseminated with the sperm of both Copeland

and Spivey.  As a result, A.C.C. was born in Minnesota on August 10, 2004.  Copeland was

listed on the birth certificate as A.C.C.'s father, even though no DNA test had verified biological paternity at that time.

On August 15, 2004, with the consent of Prashad, Copeland and Spivey moved with A.C.C. to North Carolina. Prashad later visited A.C.C. in North Carolina on a number of occasions.

The relationship between the parties was initially very open and cordial. However, after February of 2005, the relationship began to deteriorate. Prashad's subsequent requests to see A.C.C. and inquiries into her well-being went unanswered.

In April of 2005, Prashad and her husband traveled to North Carolina with the intent to return to Minnesota with A.C.C. Following a confrontation between the parties, Copeland and Spivey refused to allow Prashad access to A.C.C. Copeland and Spivey then moved from North Carolina with A.C.C.

Copeland and Spivey subsequently traveled to California. On May 10, 2005, Copeland and Spivey filed a Declaration of Domestic Partnership with the State of California. Sometime thereafter Copeland and Spivey returned to North Carolina. Shortly thereafter, Copeland, Spivey and A.C.C. moved to Virginia, where they currently reside.

At some point, Prashad filed a Complaint for Custody in the General Court of Justice, District Court Division, of Gaston County, North Carolina ("North Carolina court"). Prashad sought custody of A.C.C. and a DNA test to determine the biological paternity of A.C.C. On August 16, 2005, the North Carolina court ordered Copeland to produce A.C.C. and submit to a DNA test to determine paternity.

On October 10, 2005, Spivey was determined to be the biological father of A.C.C. Spivey subsequently filed a motion to intervene on October 18, 2005. On that same day, the

North Carolina court determined that it had jurisdiction over the matter, as North Carolina was the last state of residency for Spivey, Copeland, and A.C.C.[1]

On June 13, 2006, a consent order was entered by the North Carolina court permitting Spivey to intervene. Similarly, on June 26, 2006, Copeland was allowed to intervene in the case because, as the North Carolina court stated,

> [Copeland] is listed as the father on the birth certificate of [A.C.C.], [Copeland] has been a full-time parent to [A.C.C.] since her birth and has assumed all responsibilities of being a parent to her, [Copeland] is entitled to claim a right of custody of [A.C.C.] and be a party in this custody action pursuant to [North Carolina's] custody statutes and case law, [Copeland] has an interest in the custody of [A.C.C.], the child he has raised for almost two years, and disposition of this action without his involvement will significantly impair or impede his ability to protect his relationship with [A.C.C.].

On that same day, a written agreement resolving the custody dispute was signed by Prashad, Copeland, and Spivey. The contents of the agreement were later reflected in an order entered by the North Carolina court on September 20, 2006. According to the order, Copeland and Spivey were awarded primary legal and physical custody of A.C.C.; Prashad was awarded secondary legal and physical custody.

On December 20, 2007, Prashad filed two petitions in the Fairfax Juvenile and Domestic Relations District ("J&DR") Court: "Emergency Petition for Registration and Expedited Enforcement of Child Custody Order and Petition for Ex Parte Order to Take Physical Custody of Child" ("Registration Petition") and "Petition for Modification of Custody" ("Modification Petition"). In the Registration Petition, Prashad sought immediate custody of A.C.C., registration of the four orders of the North Carolina Court (collectively referred to as the

---

[1] The written order, however, was not entered until November 2, 2005.

"custody orders"),[2] and enforcement of those orders. Prashad specifically asked the J&DR court to register the custody orders only to the extent that they addressed the parental and custodial rights of herself and Spivey. She expressly asked the J&DR court not to register the portions of the custody orders that dealt with the parental and custodial rights of Copeland. In the Modification Petition, Prashad asked the court to modify the custody orders so that she had sole legal and physical custody of A.C.C.

On March 12, 2008, after hearing argument regarding the Registration Petition, the J&DR court entered an order registering the custody orders in their totality. Prashad subsequently appealed the J&DR court's registration of the custody orders to the Fairfax County Circuit Court.

The circuit court heard argument on the matter on June 18, 2008. In a letter opinion dated August 18, 2008, the circuit court ruled that the custody orders would be registered in their entirety. A final order was entered on October 9, 2008, memorializing the circuit court's ruling. Prashad appeals.

---

[2] The custody orders consisted of 1) the August 16, 2005 order requiring the parties to appear for initial custody determination; 2) the November 2, 2005 order establishing that North Carolina had jurisdiction over the matter; 3) the June 13, 2006 consent order permitting Spivey to intervene; and 4) the September 20, 2006 order awarding primary custody to Copeland and Spivey and secondary custody to Prashad.

ANALYSIS[3]

As an initial matter, it is important to state that this case is only about the registration of

custody and visitation orders from another state under the provisions of the Parental Kidnapping

[3] The dissent contends that we need not address this case on the merits as neither the circuit court nor this Court has jurisdiction to hear this appeal. According to the dissent, because the J&DR court still has to address the Modification Petition, the order registering the custody orders is not a final order.

This argument fails for three primary reasons. First, the dissent ignores the plain language of the UCCJEA with regard to the nature of the proceedings. The plain language of the UCCJEA establishes that an enforcement proceeding and a modification proceeding are distinctly separate proceedings. See Jamil v. Jahan, 760 N.W.2d 266, 272 (Mich. Ct. App. 2008) ("We conclude that registration to enforce a child-custody determination is distinct from actually making a child-custody determination."). Code § 20-146.1 defines the term "child custody determination" as "a judgment, decree, or other order of a court providing for the legal custody, physical custody, or visitation with respect to a child. *The term includes a permanent, temporary, initial, or modification order.*" (Emphasis added). A "child custody proceeding" is defined to include modification proceedings, but the definition specifically excludes enforcement proceedings. Code § 20-146.1. Thus, by definition, a modification proceeding and an enforcement proceeding are distinct from one another.

Second, the fact that the two proceedings are distinct and independent is highlighted by the differences in the operative provisions of Article 2 (which details modification of child custody determinations) and those of Article 3 (which details the recognition and enforcement of child custody determinations). A child custody determination can only be modified if the jurisdictional requirements of Article 2 are met, Code § 20-146.14, whereas a child custody determination can be registered under Article 3 regardless of whether the registering state has jurisdiction over any of the parties, Code § 20-146.26. See also Code § 20-146.26, Official Comment (explaining that § 20-146.26 "authorizes a simple registration procedure that can be used to *predetermine* the enforceability of a custody determination" (emphasis added)).

Third, and most importantly, the UCCJEA by its terms provides for an appeal of an enforcement or registration proceeding independent of a modification proceeding. Code § 20-146.35 specifically provides that "[a]n appeal may be taken from a final order in a proceeding under [Article 3] in accordance with expedited appellate procedures in other civil cases." As previously noted, Article 3 of the UCCJEA addresses only registration and enforcement proceedings.

Thus, the Registration Petition was independent of the Modification Petition. As such, the trial court's order registering the custody orders was final, as it disposed of the whole subject of the Registration Petition, gave all the relief contemplated, and left nothing to be done in the matter. See Alexander v. Morgan, 19 Va. App. 538, 540, 452 S.E.2d 370, 371 (1995) (holding that a final order is one "that disposes of the whole subject, gives all the relief contemplated, and leaves nothing to be done in the cause save to superintend ministerially compliance with the order"). Accordingly, the circuit court had jurisdiction to hear this case when it was appealed from the J&DR court, and, therefore, this Court has jurisdiction to consider the merits of this appeal.

Prevention Act and Virginia law. Although there has been much discussion concerning homosexual marriage and same-sex relationships, both at the trial level and before this Court, neither of the parties is seeking to have the civil union between Copeland and Spivey recognized under Virginia law. Accordingly, this case is not about homosexual marriage, civil unions, or same-sex relationships.

## A. Standard of Review

"In determining whether the trial court made an error of law, 'we review the trial court's statutory interpretations and legal conclusions *de novo*.'" Rollins v. Commonwealth, 37 Va. App. 73, 79, 554 S.E.2d 99, 102 (2001) (quoting Timber v. Commonwealth, 28 Va. App. 187, 193, 503 S.E.2d 233, 236 (1998)).

## B. Foreign Custody and Visitation Determinations

### 1. Full Faith and Credit Clause

> Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

U.S. Const. art. IV, § 1.

The United States Supreme Court has recognized that

> [t]he full faith and credit clause is one of the provisions incorporated into the Constitution by its framers for the purpose of transforming an aggregation of independent, sovereign States into a nation. If in its application local policy must at times be required to give way, such "is part of the price of our federal system."

Sherrer v. Sherrer, 334 U.S. 343, 355 (1948) (quoting Williams v. North Carolina, 317 U.S. 287, 302 (1942)).

The Supreme Court has further recognized that the Full Faith and Credit Clause "prescribes a rule by which courts, Federal and State, are to be guided when a question arises in

- 6 -

the progress of a pending suit as to the faith and credit to be given by the court to the public acts, records and judicial proceedings of a State other than that in which the court is sitting."

Minnesota v. Northern Securities Co., 194 U.S. 48, 72 (1904).  Congress subsequently passed 28 U.S.C. § 1738, which, in effect, codifies the Supreme Court's holding in Northern Securities, stating:

> Such Acts, records and judicial proceedings or copies thereof . . . shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

In applying the Full Faith and Credit Clause, the Supreme Court has distinguished between statutes and judgments.  With regard to statutes, the Supreme Court has held that the Full Faith and Credit Clause does not require "a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate."  Pacific Employers Ins. Co. v. Industrial Accident Comm'n, 306 U.S. 493, 501 (1939).  Furthermore, "the Full Faith and Credit Clause does not require a state to apply another State's law in violation of its own legitimate public policy."  Nevada v. Hall, 440 U.S. 410, 422 (1979) (footnote omitted).

> Regarding judgments, however, the full faith and credit obligation is exacting.  A final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land.  For claim and issue preclusion (res judicata) purposes, in other words, the judgment of the rendering State gains nationwide force.
>
> A court may be guided by the forum State's "public policy" in determining the law applicable to a controversy.  But our decisions support no roving "public policy exception" to the full faith and credit due judgments.

Baker v. Gen. Motors Corp., 522 U.S. 222, 232 (1998) (citations and footnotes omitted).

2. Parental Kidnapping Prevention Act

In 1980, recognizing the inherent problems of applying full faith and credit to child custody agreements, Congress passed 28 U.S.C. § 1738A as an addendum to the full faith and credit statute. Commonly referred to as the Parental Kidnapping Prevention Act ("PKPA"), the chief purpose of 28 U.S.C. § 1738A was to "avoid jurisdictional competition and conflict between State courts." Pub. L. 96-611, 94 Stat. 3569 § 7(c)(5), note following 28 U.S.C. § 1738A.

"[T]he PKPA is a mandate directed to state courts to respect the custody decrees of sister states." Thompson v. Thompson, 484 U.S. 174, 183 (1988). It requires that "[t]he appropriate authorities of every State shall enforce according to its terms . . . any custody determination or visitation determination made consistently with the provisions of [the PKPA] by a court of another state." 28 U.S.C. § 1738A(a). Accordingly, the United States Supreme Court has recognized that "Congress has extended the full faith and credit requirements to child custody orders." Thompson, 484 U.S. at 187. Thus, the PKPA

> imposes a duty on the States to enforce a child custody determination entered by a court of a sister State if the determination is consistent with the provisions of the [PKPA]. In order for a state court's custody decree to be consistent with the provisions of the [PKPA], the State must have jurisdiction under its own local law and one of five conditions set out in § 1738A(c)(2) must be met. Briefly put, these conditions authorize the state court to enter a custody decree if the child's home is or recently has been in the State, if the child has no home State and it would be in the child's best interest for the State to assume jurisdiction, or if the child is present in the State and has been abandoned or abused. Once a State exercises jurisdiction consistently with the provisions of the [PKPA], no other State may exercise concurrent jurisdiction over the custody dispute, § 1738A(g), even if it would have been empowered to take jurisdiction in the first instance, and all States must accord full faith and credit to the first State's ensuing custody decree.

Id. at 175-77 (footnotes omitted).

In the present case, neither party argues that the custody orders were not made consistent with the PKPA. See 28 U.S.C. § 1738A(c); Thompson, 484 U.S. at 176-77. Indeed, the record clearly establishes that the North Carolina court had jurisdiction pursuant to North Carolina law, see N.C. Gen. Stat. § 50A-201 (2009), and A.C.C.'s home was in North Carolina within the six (6) months prior to Prashad filing her initial complaint for custody. As the custody orders were made consistently with the provisions of the PKPA, Virginia must extend full faith and credit to the custody orders, unless some other statutory or constitutional provisions dictate otherwise.

3. The Uniform Child Custody Jurisdiction and Enforcement Act

Although the PKPA requires that each state enforce the custody orders entered by a court of another state, it provides no uniform method of enforcement.[4] Recognizing that "this lack of specificity in enforcement procedures has resulted in the law of enforcement evolving differently in different jurisdictions," the National Conference of Commissioners on Uniform State Laws drafted the UCCJEA. The stated purpose of the UCCJEA was to bring existing state laws into compliance with the PKPA and to bring uniformity to the enforcement procedures. Virginia has since adopted and enacted the UCCJEA. See Code § 20-146.1 *et. seq.*

Although the UCCJEA is comprised of four articles, in the present case, only Article 3 is at issue. Consistent with the PKPA, Article 3 "requires the courts of this Commonwealth to 'recognize and enforce' appropriate child custody determinations of the courts of other states." Tyszcenko v. Donatelli, 53 Va. App. 209, 218, 670 S.E.2d 49, 54 (2008). "Article 3 also

---

[4] Although the PKPA mandates that "[t]he appropriate authorities of every State shall enforce according to its terms . . . any custody determination or visitation determination," there is no further mention of enforcement within the Act. 28 U.S.C. § 1738A(a). Thus, it does not specifically address registration. The UCCJEA was promulgated and adopted by a majority of the states to address the mechanics of enforcement, including registration. See UCCJEA Prefatory Note, 9 U.L.A. 649, 652 (1997).

addresses the mechanisms by which child custody determinations may be enforced, as well as other aspects of enforcement proceedings under the UCCJEA." Id.

The UCCJEA states:

> A court of this Commonwealth shall recognize and enforce a child custody determination of a court of another state if the latter court exercised jurisdiction in substantial conformity with this act . . . and the determination has not been modified in accordance with this act.

Code § 20-146.24.

The first step in the recognition and enforcement of a foreign child custody determination is registering that order with "the appropriate juvenile and domestic relations district court in this Commonwealth." Code § 20-146.26(A). Such registration is accomplished by sending 1) a request for registration; 2) two copies of the determination to be registered (including one certified copy) and "a statement under penalty of perjury that to the best of the knowledge and belief of the person seeking registration the order has not been modified;" and 3) "the name and address of the person seeking registration and any parent or person acting as a parent who has been awarded custody or visitation" to the appropriate court. Id. Upon receipt of the required documents, Code § 20-146.26 clearly states that "the registering court *shall* [c]ause the determination to be filed as a foreign judgment." Code § 20-146.26(B)(1) (emphasis added).

Upon registration, "[a] court of this Commonwealth shall recognize and enforce, *but may not modify*, except in accordance with Article 2 (§ 20-146.12 et seq.) of this chapter, a registered child custody determination of a court of another state." Code § 20-146.27(B) (emphasis added). Under the UCCJEA, "'Modification' means a child custody determination that changes, replaces, supersedes, or is otherwise made after a previous determination concerning the same child, whether or not it is made by the court that made the previous determination." Code § 20-146.1. Thus, during registration,

- 10 -

> [t]he scope of the enforcing court's inquiry is limited to the issue of whether the decree[ing] court had jurisdiction and complied with due process in rendering the original custody decree. No further inquiry is necessary because neither Article 2 nor the PKPA allows an enforcing court to modify a custody determination.

UCCJEA Prefatory Note, 9 U.L.A. 649, 653 (1997); see also Official Comment to Code § 20-146.24 ("The changes made in Article 2 of this Act now make a State's duty to enforce and not modify a child custody determination of another State consistent with the enforcement and nonmodification provisions of the PKPA."). Thus, it is clear that the UCCJEA takes an all-or-nothing approach to the registration of child custody determinations.

In the present case, because the North Carolina court exercised jurisdiction in substantial conformity with the UCCJEA, unless some other statutory or constitutional provisions dictate otherwise, the trial court was required to register the custody orders in their entirety or not register them at all.

### C. The Defense of Marriage Act

Prashad argues that the Defense of Marriage Act ("DOMA"), 28 U.S.C. § 1738C, trumps the PKPA and creates an exception to the Full Faith and Credit Clause with regard to custody determinations involving same-sex couples in a relationship that is tantamount to marriage. Thus, Prashad contends that Virginia need not extend full faith and credit to the custody orders.

DOMA, 28 U.S.C. § 1738C, passed by Congress in 1996, is another addendum to the full faith and credit statute, 28 U.S.C. § 1738. DOMA allows a state to refuse to give full faith and credit to another state's determination that "a relationship between persons of the same sex . . . is treated as marriage." 28 U.S.C. § 1738C.[5] Similarly, DOMA allows a state to deny recognition

---

[5] 28 U.S.C. § 1738C states:

> No State, territory, or possession of the United States, or Indian tribe, shall be required to give effect to any public act, record, or judicial proceeding of any other State, territory, possession, or tribe

- 11 -

of "a right or claim arising from such relationship." Id. Thus, DOMA is permissive in nature, meaning that it allows each state to decide for itself what effect, if any, that state will give to same sex relationships that are treated as a marriage under the laws of another state and the rights or claims arising therefrom. See H.R. Rep. No. 104-664, at 2 (1996), reprinted in 1996 U.S.C.C.A.N. 2905, 2906.[6]

However, as neither party is asking the Court to recognize Copeland and Spivey's relationship as a valid marriage in the Commonwealth of Virginia and, as will be discussed below, the custody orders did not arise from Copeland and Spivey's relationship being treated as

---

respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State, territory, possession, or tribe, or a right or claim arising from such relationship.

[6] An examination of the legislative history of DOMA demonstrates its permissive nature.

[DOMA] has two primary purposes. The first is to defend the institution of traditional heterosexual marriage. *The second is to protect the right of the States to formulate their own public policy regarding the legal recognition of same-sex unions, free from any federal constitutional implications that might attend the recognition by one State of the right for homosexual couples to acquire marriage licenses.*

To achieve these purposes, [DOMA] has two operative provisions. Section 2, entitled "Powers Reserved to the States," provides that *no State shall be required to accord full faith and credit to a marriage license issued by another State if it relates to a relationship between persons of the same sex.* And Section 3 defines the terms "marriage" and "spouse," for purposes of federal law only, to reaffirm that they refer exclusively to relationships between persons of the opposite sex.

H.R. Rep. No. 104-664, at 2, reprinted in 1996 U.S.C.C.A.N. at 2906 (emphasis added); see also id. at 18, reprinted in 1996 U.S.C.C.A.N. at 2922 ("It is surely a legitimate purpose of government to take steps to protect the right of the people, *acting through their state legislatures*, to retain democratic control over the manner in which the States will define the institution of marriage. [DOMA] advances this most important government interest." (emphasis added)).

a marriage, DOMA is inapplicable to the present case.  As DOMA is inapplicable to the present case, we make no decision as to what effect, if any, DOMA has upon the PKPA.

### D.  The Virginia Marriage Amendment

Prashad argues that registering the custody orders in their entirety under the UCCJEA violates the Virginia Constitution, specifically, the Virginia Marriage Amendment ("VMA"), Va. Const. art. I, § 15-A.  Prashad posits that Copeland's custodial and visitation rights arise from his relationship with Spivey and are therefore an "effect of marriage."  According to Prashad, the VMA prohibits the recognition of such "effects of marriage," and thus the trial court erred in registering the custody orders.

The VMA states:

> That only a union between one man and one woman may be a marriage valid in or recognized by this Commonwealth and its political subdivisions.
>
> This Commonwealth and its political subdivisions *shall not create or recognize a legal status* for relationships of unmarried individuals that intends to approximate the design, qualities, significance, or effects of marriage.  Nor shall this Commonwealth or its political subdivisions *create or recognize* another union, partnership, or other legal status to which is assigned the rights, benefits, obligations, qualities, or effects of marriage.

Va. Const. art. I, § 15-A (emphasis added).

The operative language of the VMA prohibits the Commonwealth creating or recognizing relationships that are "assigned the rights, benefits, obligations, qualities, or effects of marriage."  As noted above, neither party is asking the Court to recognize Copeland and Spivey's relationship.  Therefore, registration of the custody orders does not implicate the VMA under the facts of this case.

Prashad, however, goes on to argue that, by registering the custody orders, the trial court "tacitly" recognized the relationship between Copeland and Spivey.  In support of this argument,

Prashad posits that the only basis that the North Carolina court had to grant custody to Copeland was his relationship with Spivey. Assuming, *arguendo*, that the VMA prohibits such tacit recognition of same-sex relationships, Prashad would still have to prove that the North Carolina court's grant of custodial rights to Copeland arose out of his relationship with Spivey.

We begin by noting that, like Virginia, North Carolina does not recognize same sex marriage. See N.C. Gen. Stat. § 51-1.2 (2009) ("Marriages, whether created by common law, contracted, or performed outside of North Carolina, between individuals of the same gender are not valid in North Carolina."). Furthermore, the only reference to Copeland and Spivey's homosexual relationship appears in the November 2, 2005 order establishing that North Carolina had jurisdiction over the matter. It is highly illogical that the North Carolina court granted Copeland's custodial rights based on a relationship that the State of North Carolina does not recognize and that the North Carolina court does not acknowledge in its orders.

It is important, however, that, in allowing Copeland to intervene in the initial custody dispute, the North Carolina court made no mention of Copeland's relationship to Spivey. Rather, the North Carolina court clearly stated that Copeland was allowed to intervene as an interested party because

> [Copeland] has been a full-time parent to [A.C.C.] since her birth and has assumed all responsibilities of being a parent to her, [Copeland] has an interest in the custody of [A.C.C.], the child he has raised for almost two years, and disposition of this action without his involvement will significantly impair or impede his ability to protect his relationship with [A.C.C.].

Prashad's contention that "[t]here is no basis for Copeland to have formed a relationship with ACC aside from his relationship with Spivey" has no basis in fact. To accept this proposition, this Court would have to ignore the specific basis on which the North Carolina court allowed Copeland to intervene. We would also have to ignore the fact that Copeland's name is

on A.C.C.'s birth certificate, that Copeland allowed A.C.C. to use his surname,[7] and that, for all intents and purposes, all parties believed Copeland was A.C.C.'s biological father for the first fourteen (14) months of her life until the DNA tests proved otherwise. Virginia has long recognized these facts, among others, to be clear and convincing evidence of paternity. See, e.g., Code § 64.1-5.2.

Thus, it is readily apparent that the North Carolina court determined that Copeland's custodial rights arose out of the fact that he has a legitimate interest in A.C.C. for purposes of custody and visitation, and not from his relationship with Spivey being treated as a marriage under the laws of North Carolina. In light of the fact that Copeland has a legitimate interest in A.C.C., we cannot say that registration of the custody orders is "tacit" recognition of Copeland and Spivey's relationship.

### E. Marriage Affirmation Act

In her final argument, Prashad contends that the Marriage Affirmation Act ("MAA"), Code § 20-45.3, forbade the trial court from registering the custody orders in their entirety. Specifically, Prashad argues that, under the MAA, the September 20, 2006 order awarding primary custody to Copeland and Spivey and secondary custody to Prashad is a "partially void order." Again, we must disagree.

The MAA reads:

> A civil union, partnership contract or other arrangement between persons of the same sex purporting to bestow the privileges or obligations of marriage is prohibited. Any such civil union, partnership contract or other arrangement entered into by persons of the same sex in another state or jurisdiction shall be void in all

---

[7] A.C.C.'s surname is hyphenated, incorporating the surnames of both Copeland and Spivey.

- 15 -

> respects in Virginia and any contractual rights created thereby shall
> be void and unenforceable.

Code § 20-45.3.

Prashad's argument regarding the MAA relies on the same logic as her VMA argument, namely, that Copeland's custodial and visitation rights arise out of his relationship with Spivey. Prashad's attempt to characterize the September 20, 2006 order as a contract does not change our analysis. As we previously noted, Copeland's custodial and visitation rights arise, not out of his relationship with Spivey, but out of his relationship with A.C.C. Accordingly, this argument fails for the same reasons as Prashad's argument regarding the VMA.

<u>CONCLUSION</u>

We hold that the trial court correctly determined that full faith and credit must be extended to the custody orders in this case. Accordingly, we affirm the trial court's decision to register the custody orders in their entirety.

<u>Affirmed.</u>

Beales, J., dissenting.

After reviewing the record and argument, I would find that this appeal is not properly before us. I believe this Court should not address the merits here because this appeal was not ripe for consideration by the circuit court nor ripe for consideration by this Court. Cf. Jewell Ridge Coal Corp. v. Henderson, 229 Va. 266, 268-69, 329 S.E.2d 48, 50 (1985) (noting that the decision of a commission to deny peer review is not ripe for appeal as no final decision on the merits of the case have been reached). The Fairfax County Circuit Court did not have jurisdiction to take this case on appeal, and, therefore, the Court of Appeals should not consider the questions presented in this case, given its posture.

Under Virginia's statutes, which limit the jurisdiction of the courts, "[a]n appeal may be taken *from a final order* in a proceeding under" the UCCJEA. Code § 20-146.35 (emphasis added). See also Code § 16.1-296 (allowing appeals to circuit courts "[f]rom any *final order or judgment* of the juvenile court" (emphasis added)). The legislature has limited the circuit courts' ability to hear appeals from the JDR courts to those appeals that are "provided by law," i.e., final orders. Code § 17.1-513; Walker v. Department of Public Welfare, 223 Va. 557, 562, 290 S.E.2d 887, 890 (1982) ("Only final orders [of a JDR court] are appealable."). Thus, an action becomes ripe for appeal and within the subject matter jurisdiction of the circuit court when the JDR court has entered an order that is final, i.e., one "that disposes of the whole subject, gives all the relief contemplated, and leaves nothing to be done in the cause save to superintend ministerially compliance with the order." Alexander v. Morgan, 19 Va. App. 538, 540, 452 S.E.2d 370, 371 (1995). If the JDR court order regarding registration is a final order, then appeal to the circuit court was appropriate. However, I do not believe it was a final order.

Initially, to determine whether the JDR order was a final order, it is important to consider the posture of this case – what relief the petitioner requested and what remained to be done.

Here, Prashad initiated the case by filing two petitions in the JDR court, one labeled "Emergency Petition for Registration and Expedited Enforcement of Child Custody Order and Petition for Ex Parte Order to Take Physical Custody of Child" (Emergency Petition) and another labeled "Petition for Modification of Custody" (Modification Petition). In the Emergency Petition and its memorandum, Prashad asked for immediate physical custody of the child, registration of four North Carolina orders which included a September 20, 2006 consent order regarding custody of A.C.C. ("with the exception of any and all orders recognizing any parental rights" of Copeland), and enforcement of some provisions in the September 20, 2006 custody order, such as ordering Spivey and Copeland to allow her visitation with the child. The Emergency Petition also referenced the Modification Petition as providing additional support for the Emergency Petition. The Modification Petition asked that Prashad be granted sole legal and physical custody of A.C.C., and it specifically referenced the same four North Carolina orders that were listed in the Emergency Petition. The arguments in the Modification Petition were essentially the same as those in the Emergency Petition and its supporting memorandum.

Although the actual order is not contained in the record before this Court, it appears based on the parties' representations that the JDR court denied the request in Prashad's Emergency Petition for physical custody of the child fairly soon after the petitions were filed. The JDR court then set a hearing for September 16 and 18, 2008, on the Modification Petition.

In addition, the JDR court heard argument on the registration of the North Carolina orders on March 12, 2008. During that hearing, the court explained, "Obviously, before this Court can do anything, whether enforcement or modification of the North Carolina order, it has to first register it . . . ." The court noted, "It is up to this Court at this point, once the registration has been addressed to then address, obviously, the grounds of modification in terms of what [the child's] best interests are, and how these two individuals are connected to her in terms of this

child's well-being." The JDR court found all four North Carolina orders should be registered in their entirety and entered a handwritten order, retroactively registering the orders as of the day that Prashad had filed her petitions with the JDR clerk's office. The handwritten order does not mention the pending hearing on modification of the North Carolina custody order, which was still on the JDR court's docket.

Prashad then filed a notice of appeal in the JDR clerk's office. The notice indicated that she was appealing to the circuit court from an "order registering (4) NC orders with respect to Copeland."

In the circuit court, Spivey filed a "Motion for Summary Judgment" and supporting memorandum. In her written response to Spivey's motion, Prashad noted that the September 2008 hearing in the JDR court[8] was set "so that the matter currently before this [Circuit] Court could be decided, as the determination would involve whether or not Copeland would remain a party to the case." During the hearing on the motion for summary judgment, Prashad's counsel noted that she had "invoked the jurisdiction of the court which allows for, under the UCCJEA, simultaneous requests for enforcement and registration [of orders]." She also noted that "in order to modify [the North Carolina order], this Court has to register it . . ." and pointed out that registering an order was the first step towards its modification.

The circuit court granted Spivey's motion for summary judgment and entered an order, dated October 9, 2008, that registered the North Carolina orders in their entirety and remanded the case "to the jurisdiction" of the JDR court. Prashad then appealed to this Court from the circuit court's order.

_____

[8] The JDR court held this hearing in September 2008, according to the representations of the parties, but did not enter its order denying the Modification Petition until after the circuit court had granted Spivey's motion for summary judgment and Prashad had noted her appeal of that ruling to this Court. At present, we are informed by the parties, an appeal of the JDR court's refusal to modify the North Carolina custody order is pending in the circuit court.

I would find that the JDR court's order to register the four North Carolina orders in their entirety was not a final order in this matter. This order, although it responded to a request in the Emergency Petition, was integral to the relief that Prashad had requested simultaneously – that she be given primary custody of A.C.C. – in the Modification Petition.[9] As she (and both lower courts) admitted during these proceedings, registration of the orders was simply a preliminary step to reaching the actual issue in this case – possible modification of the North Carolina custody order.

Registration is usually a preliminary step to enforcement or amendment of a custody order previously entered by an out-of-state court. See Code §§ 20-108; 20-146.26; 20-146.27; cf. Ohlen v. Shively, 16 Va. App. 419, 423, 430 S.E.2d 559, 561 (1993) (discussing the change of circumstances requirement for amendment of pre-existing orders). Under Code § 20-146.26(A), "[a] child custody determination issued by a court of another state may be registered in this Commonwealth, with or without a simultaneous request for enforcement, by sending [the appropriate documents] to the appropriate juvenile and domestic relations district court in this Commonwealth . . . ." Here, Prashad filed the request for registration of the four North Carolina orders "with a simultaneous request" for enforcement and for modification of the custody order because she wanted the North Carolina custody order amended to give her sole custody of the child and to take the custody rights of both Spivey *and* Copeland. Clearly, registration here was simply a procedural prerequisite to the overall enforcement and modification action that Prashad initiated and was pursuing. Cf. Gary v. Board of Zoning Appeals, 246 Va. 1, 1-2, 429 S.E.2d 875, 875 (1993) (finding the appeal was not ripe because the board had not made a decision regarding the property in dispute and, thus, had not "exhausted"

---

[9] The substantive relief requested in the Emergency Petition, that Prashad be granted temporary custody of the child and that her visitation be enforced, was denied prior to the JDR court's hearing on registration of the orders. That order was not appealed to the circuit court.

its "powers" over the controversy). In fact, the JDR court apparently did not believe that its order registering the four North Carolina orders was a final order in the case. As that court noted during the March 12, 2008 hearing, "Obviously, before this Court can do anything, whether enforcement or modification of the North Carolina order, it has to first register it . . . ." Cf. Alexander, 19 Va. App. at 540, 452 S.E.2d at 372 (noting that the Norfolk JDR court's memorandum clearly stated that the court expected an endorsed order would be entered and that the case was continued, and, therefore, the memorandum was not the final order).[10]

Both of Prashad's petitions involved the same adverse parties, the same child, and the same orders, and they were filed simultaneously in the JDR court. When the JDR court denied her request for registration of only part of the North Carolina orders, that court did not resolve all the issues between the parties. Whether the orders were registered in full or in part, their registration did not resolve the substantive issues raised in the simultaneously filed petitions. See Whitaker v. Day, 32 Va. App. 737, 743, 530 S.E.2d 924, 927 (2000) (finding that an order is not final simply because it will possibly affect the outcome of a case). By simply entering the registration order, the JDR court had not yet resolved the controversy raised in the simultaneously filed petitions. That court still had to determine whether Prashad's custody rights, Spivey's custody rights, and, of course, Copeland's custody rights would remain the same as initially granted in the September 20, 2006 North Carolina custody order. Therefore, there was no final order entered here, "one that disposes of the whole subject, gives all the relief contemplated, and leaves nothing to be done in the cause save to superintend ministerially

---

[10] The fact that Prashad filed two petitions is not controlling in this analysis. Cf. Comcast of Chesterfield County, Inc. v. Board of Supervisors, 277 Va. 293, 301, 672 S.E.2d 870, 873-74 (2009) (finding that, although the circuit court had bifurcated the proceedings to address a classification issue first, the order on classification was not a final order). Each of Prashad's petitions essentially requests the same relief – that she be granted primary custody of the child. Therefore, her decision to use more than one petition should not control the jurisdiction of the courts in this matter.

compliance with the order." Alexander, 19 Va. App. at 540, 452 S.E.2d at 371; McLane v. Vereen, 278 Va. 65, 70, 677 S.E.2d 294, 297 (2009). Thus, the circuit court did not have jurisdiction to consider the appeal of the March 12, 2008 JDR court order. Code § 17.1-513; Walker, 223 Va. at 562, 290 S.E.2d at 890.[11]

The majority opinion contends in a footnote that the March 12, 2008 JDR court order was a final order, relying on language in the UCCJEA and a Michigan case that distinguishes the registration of an order from other "proceedings." However, neither the UCCJEA nor Jamil v. Jahan, 760 N.W.2d 266 (Mich. Ct. App. 2008), defines a "final order." Therefore, these points made by the majority here are not particularly relevant to this case, as the fact that proceedings can be "distinctly separate" in the abstract does not establish the fact that an order *in a particular case* is final.

As discussed *supra*, final orders resolve the controversies between the litigants. In order to determine if the controversies are resolved, examination of the particular proceedings in the case, including the parties' petitions and motions, is often required. Therefore, simply indicating that two requests are "separate" does not resolve the question of whether an order is final.[12] Instead, the particular case must be examined to determine if an order is final. In this case, the registration of the custody order did not resolve the controversy. Here, although Prashad filed separate petitions and gave them separate titles, in *both* petitions she asked that the existing

_____

[11] If the order registering the North Carolina orders is considered an interlocutory order of the JDR court, then my analysis on this issue would not change. Under Code § 16.1-296, "[t]he only provision [in the Code sections on JDR court procedure] relating to appeals from the juvenile court to the circuit court," only final orders can be appealed, not interlocutory orders. Walker, 223 Va. at 562, 290 S.E.2d at 890. Therefore, the JDR court's order registering the four North Carolina orders, if interlocutory, still was not appealable to the circuit court.

[12] For example, although modification of child support and enforcement of child support are separate proceedings, a party cannot necessarily appeal one determination without appealing the other. See Sharma v. Sharma, 46 Va. App. 584, 592-93, 620 S.E.2d 553, 557-58 (2005).

- 22 -

North Carolina custody order be modified. In the Emergency Petition, she did not simply ask that the pre-existing order be registered, but instead asked that a portion of the order be excluded, effectively asking the JDR court to modify the order without considering if any change of circumstances had occurred since the entry of the order. Therefore, although there may be instances where an order that registers an out-of-state custody order is a final order, we are not presented with such an instance here, especially since both petitions in this case (the one acted on by the JDR court and the one that had not been) dealt with the same custody and visitation dispute between the same parties over the same child. In short, both petitions filed here dealt with the same overall dispute, which was not resolved by simply registering the North Carolina orders, since their registration still left the biggest part of the dispute to be resolved later by the JDR court.

In Sharma v. Sharma, 46 Va. App. 584, 592-93, 620 S.E.2d 553, 557-58 (2005), this Court discussed attempts to appeal an individual order entered by a JDR court in child support cases. In Sharma, the appellant claimed he was not required to provide an appeal bond because he appealed only the JDR order that had increased the amount of his child support obligation, but not the JDR order finding that he was in arrears. We found in that case that, where orders are "intrinsically, inherently, and logically related," a party cannot appeal only one of several orders entered during resolution of the issues. Id. at 592, 620 S.E.2d at 557. We then concluded that "these two issues could not be separated on appeal, nor could the judgment appealed be bifurcated." Id. Here, similarly, the issues of registration of the North Carolina custody order and of modification of that same order cannot be separated and should not have been bifurcated by an appeal.[13]

_____

[13] If appeals such as the current one are allowed, then the circuit courts and this Court will be asked to resolve numerous half-litigated cases. For example, if a court entered an order finding that a contract was enforceable, under the example provided by the case currently before

- 23 -

Furthermore, the fact that the parties here do not raise this issue on appeal is irrelevant.

> Subject matter jurisdiction alone cannot be waived or conferred on the court by agreement of the parties. A defect in subject matter jurisdiction cannot be cured by reissuance of process, passage of time, or pleading amendment. While a court always has jurisdiction to determine whether it has subject matter jurisdiction, a judgment on the merits made without subject matter jurisdiction is null and void. *Likewise, any subsequent proceeding based on such a defective judgment is void or a nullity.*
>
> Even more significant, the lack of subject matter jurisdiction can be raised at any time in the proceedings, even for the first time on appeal by the court *sua sponte*.

Morrison v. Bestler, 239 Va. 166, 169-70, 387 S.E.2d 753, 755-56 (1990) (citations omitted) (emphasis added). Therefore, as the circuit court did not have jurisdiction at the time it entered its order, any ruling that we reach in this case would likewise be void. Id. at 170, 387 S.E.2d at 756.

In summary, I believe the circuit court did not have jurisdiction to consider Prashad's appeal because she did not appeal a final order of the JDR court. Consequently, we should not consider the merits of the circuit court's void order. Therefore, I respectfully dissent.

---

us, then that order would be appealable before that initial court could address the more substantive controversies in the case, such as whether a party breached the contract and what remedy was appropriate, if any. In addition to the obvious problems of judicial economy from such appeals, this Court would also find it extremely difficult to apply Code § 8.01-678 and determine whether any error in the lower court was harmless because the effect of any error on the ultimate outcome of the case would still be unknown. Indeed, this case presents such a problem as it is unclear how any alleged error in registering the North Carolina orders materially affected Prashad and her child custody rights, which are still being litigated in the Fairfax courts.