COURT OF APPEALS OF VIRGINIA


Present:  Judges Frank, Humphreys and McClanahan
Argued at Salem, Virginia


ANDREA S. MORRISON
                                                          OPINION BY
   v.  Record Nos. 0064-10-3 and           JUDGE ROBERT J. HUMPHREYS
              1098-10-3                            FEBRUARY 8, 2011

ADAM MORRISON


                    FROM THE CIRCUIT COURT OF FLOYD COUNTY
                              Ray W. Grubbs, Judge

              Stephen J. Cullen (Christopher Brown; Kelly A. Powers; Miles &
              Stockbridge, P.C., on brief), for appellant.

              Jonathan Rogers for appellee.


        Andrea Morrison ("mother") appeals the Floyd County Circuit Court's refusal to register

and enforce a Michigan divorce decree, dated September 17, 2003, awarding her sole legal and

physical custody of her daughter, J.M., born October 14, 2002.  Mother contends the reason

given by the court in refusing to register and enforce the decree is not among the reasons listed in

the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") for a court's refusal

to register and enforce custody orders from other jurisdictions.  Adam Morrison ("father")

responds that this Court should dismiss mother's appeal pursuant to the fugitive disentitlement

doctrine.  On the merits, father alleges the circuit court did not err in refusing to register the

decree because it was modified in 2008.  For the following reasons, we find that the fugitive

disentitlement doctrine does not compel dismissal in this case.  However, we affirm the circuit

court's refusal to register the 2003 Michigan order because it was subsequently modified in

2008.

## I. Background

Mother and father were married on March 21, 2002. Their daughter, J.M., was born on October 14, 2002. The family resided at that time in Michigan. Mother filed for divorce in the Circuit Court for Washtenaw County ("Michigan court") on February 21, 2003. The Michigan court entered a Default Judgment for Divorce on September 17, 2003 ("2003 Michigan decree"), awarding mother sole legal and physical custody of J.M., and providing that father "shall have reasonable parenting time as the parties mutually agree until further order of the Court or until [J.M.] reaches the age of 18." The 2003 Michigan decree also provided that mother could not relocate the residence of the minor child more than 100 miles from the child's residence in Michigan without prior approval from the Michigan court, and it ordered mother to provide twenty-one days written notice to the Michigan court of any relocation of the child.

In November 2007, mother relocated to Bad Ischl, Austria, with J.M., without first seeking prior approval from the Michigan court as required by the 2003 Michigan decree. She also did not provide the Michigan court with her new address in Austria within twenty-one days as also required by the decree. Rather, mother provided the Michigan court with written notice of her Austrian address nearly a year later on July 1, 2008.

On January 7, 2008, the Probate Court for the County of Washtenaw in Michigan entered an order for judgment against mother, finding that mother had converted her father's funds, and had impermissibly left the United States for an undetermined period of time.

On July 3, 2008, the Michigan court entered an order modifying father's visitation schedule with J.M. ("July 2008 visitation modification order"). The July 2008 visitation modification order provided additional telephone contact between father and J.M., along with bimonthly visitation from Virginia where father was then living. Shortly thereafter, on August 15, 2008, father filed in the Michigan court a motion seeking to enforce the July 2008 visitation

modification order, to modify custody, for an order for the immediate return of the child to Michigan, to abate child support, and for an order to show cause and hold mother in contempt of court. Because mother's residence in Austria was unknown to father, service of process for father's motion was at mother's last known address in Michigan, and upon her counsel named in the 2003 Michigan decree.[1] There was no actual notice to mother in Austria regarding the August 2008 hearing.

On September 16, 2008, the Michigan court entered an order ("2008 Michigan custody modification order") awarding temporary physical custody of J.M. to father, and ordering that J.M. be returned to the United States pending resolution of a criminal complaint for kidnapping against mother. The Michigan court also issued a bench warrant against mother. On March 23, 2009, an amended criminal complaint was filed against mother in the United States District Court for the Eastern District of Michigan. An indictment for International Parental Kidnapping and Passport Fraud was issued against mother on April 22, 2009.

In April 2009, father traveled to Austria to bring J.M. back to the United States. On April 15, 2009, mother was arrested in Austria, and the Austrian police removed J.M. from her kindergarten class and delivered J.M. to father. On April 16, 2009, the Austrian court released mother from police custody and determined that extradition of mother to the United States would require an additional hearing. The 2008 Michigan custody modification order was never registered in Austria.

---

[1] Although mother had provided the Michigan court with her Austrian address on July 1, 2008, father asserted he did not know mother's address in Austria. He explained that he served mother at her last known address in Michigan. The Michigan court accepted this explanation in finding mother had been properly served.

On June 4, 2009, without notice to father, the Austrian court issued a declaratory decision and order ("2009 Austrian order") determining that the Austrian court had jurisdiction to make a custody determination of J.M. and prohibiting father from removing J.M. from Austria. Nevertheless, father had already removed J.M. from Austria and returned with her to Virginia. Father and J.M. currently reside in Virginia.

Upon father's return to the United States with J.M., mother filed a request to register the 2003 Michigan decree and the 2009 Austrian order in the Juvenile and Domestic Relations District Court for Floyd County in Virginia ("J&DRC"). Father contested the registration, and the J&DRC held a hearing on June 9, 2009. Mother's counsel appeared on behalf of mother, and father appeared *pro se*. By order dated October 9, 2009, the J&DRC granted mother's request and ordered that the 2003 Michigan decree and the 2009 Austrian order be "registered as orders of the Commonwealth of Virginia for purposes of enforcement." The J&DRC ordered that J.M. be returned to mother on or before October 24, 2009. Father appealed the matter to the Circuit Court for Floyd County and requested that the circuit court register the 2008 Michigan custody modification order.

On December 11, 2009, mother filed a motion in the circuit court for the return of J.M.'s passport to her. On December 14, 2009, the circuit court entered an order denying both parties' requests for registration of the various orders. The circuit court explained that it declined to register the 2003 Michigan decree because mother had violated the decree when she removed J.M. from Michigan without prior approval of the Michigan court. The court declined to register the 2009 Austrian order because it had been entered without notice and opportunity for father to be heard in Austria. The circuit court also denied father's request to register the 2008 Michigan custody modification order because it found that order had been issued without notice and

- 4 -

opportunity for mother to be heard in Michigan.  Finally, the court ordered the case continued for a hearing on the issue of the return of J.M.'s passport.

Mother objected to the circuit court's December 14, 2009 order on the basis that the 2003 Michigan decree was held to be a valid order, that no contempt proceeding for mother's alleged violation of that order had ever occurred, that even if mother was in contempt, such contempt was not a valid reason under the UCCJEA for refusal to register the order, that she has met the conditions for registration of the order under the UCCJEA, and, "for the other reasons cited in the memorandum filed by" mother.  Mother filed a notice of appeal from the December 14, 2009 order to this Court on January 13, 2010.

On April 20, 2010, the circuit court entered a final order providing that J.M.'s passport remain held by the clerk of the circuit court pending the resolution of mother's appeal in this matter.  Mother filed a notice of appeal from that order on May 20, 2010.  On June 14, 2010, mother filed a written statement of facts in lieu of transcript.  The circuit court, after making a number of corrections, adopted the statement of facts as "accurate and complete" on July 15, 2010.

This appeal followed.

## II.  Analysis

Mother's sole contention on appeal is that the circuit court erred in refusing to register the 2003 Michigan decree in Virginia based only on mother's purported violation of the decree.[2] Mother argues her alleged contempt of the order is not a valid reason to refuse registration of the order under the UCCJEA.

---

[2] Mother does not appeal the trial court's refusal to register the 2009 Austrian order.

- 5 -

A.  Motion to dismiss

Father filed a motion to dismiss this appeal under the fugitive disentitlement doctrine.  In support of his motion, father contends mother is a fugitive from justice because "sometime in 2007, [she] absconded from Michigan to Austria in violation of Orders from two Michigan courts and the laws of the United States of America."  Father asserts mother "had been ordered to turn in her passport to the Michigan probate court because she was a flight risk in a case where she had been found to have stolen over a million dollars."  Father's motion also asserts that mother "fraudulently obtained a duplicate passport and fled Michigan's jurisdiction violating the relocation provision" of the 2003 Michigan decree, which prohibited her both from removing J.M.'s domicile from the State of Michigan and from changing J.M.'s legal residence to a location more than 100 miles away without court approval.  Father reasons that "through her unlawful and contemptuous kidnapping of the parties' daughter from Michigan, mother also violated the [July 2008 visitation modification order] which granted parenting time to father and which set a review date to consider expansion of father's parenting time."[3]  Father also underscores mother's refusal to submit to the United States of America on an indictment charging her with parental kidnapping.

"Fugitive disentitlement is a doctrine that springs out of the inherent power of courts to enforce their judgments and protect their dignity."  Matsumoto v. Matsumoto, 792 A.2d 1222, 1227 (N.J. 2002) (citation omitted).  "In essence, it provides that a fugitive from justice may not seek relief from the judicial system whose authority he or she evades."  Id.  "The fugitive disentitlement doctrine, although traditionally applied to criminal cases, extends to civil cases as well," Moscona v. Shenhar, 50 Va. App. 238, 250, 649 S.E.2d 191, 196 (2007), aff'd sub nom,

---

[3] Father did not attempt to register the July 2008 visitation modification order, nor does he appeal the circuit court's refusal to register and enforce the 2008 Michigan custody modification order; thus, neither order is before us.

- 6 -

Sasson v. Shenhar, 276 Va. 611, 667 S.E.2d 555 (2008), since "it is the flight or refusal to return in the face of judicial action that is the critical predicate to fugitive disentitlement," Matsumoto, 792 A.2d at 1233.

"In order to employ the doctrine," the record must show that "(1) the appellant [is] a fugitive, (2) there [is] a nexus between the current appeal and the appellant's status as a fugitive, and (3) dismissal [is] necessary to effectuate the policy concerns underlying the doctrine." Sasson, 276 Va. at 623, 667 S.E.2d at 561 (citations omitted). Some of the policy concerns underlying the doctrine "include prejudice to the opponent, delay, frustration, and unenforceability." Walsh v. Walsh, 221 F.3d 204, 215 (1st Cir. 2000). A court may also consider "the inequity of allowing [the] fugitive to use the resources of the courts only if the outcome is an aid to him," and "the discouragement of flights from justice." Moscona, 50 Va. App. at 251, 649 S.E.2d at 197 (citation omitted). A court's use of the doctrine "must 'be a reasonable response to the problems and needs that provoke it.'" Sasson, 276 Va. at 623, 667 S.E.2d at 561 (quoting Degen v. United States, 517 U.S. 820, 823-24 (1996)). Because "[t]he sanction of disentitlement is most severe and could actually disserve the dignitary purposes for which it is invoked," Degen, 517 U.S. at 828, an appellate court "must exercise discretion in determining whether to apply the doctrine, which is equitable rather than jurisdictional in nature," Moscona, 50 Va. App. at 252, 649 S.E.2d at 198.

Applying these principles, we first find that mother is clearly a fugitive. We note that, "although a litigant may qualify as a fugitive by fleeing the jurisdiction, a litigant may also, 'while legally outside the jurisdiction, constructively flee by deciding not to return.'" Id. at 251, 649 S.E.2d at 197 (quoting Matsumoto, 792 A.2d at 1228). While several of the assertions underlying father's contention that mother is a fugitive are plainly disingenuous in that mother had already left Michigan before any of the 2008 orders were entered against her, mother

- 7 -

concedes she is aware of the outstanding warrant for her arrest for violating the 2003 Michigan decree, and she has knowledge of a federal indictment charging her with parental kidnapping. And yet, mother has refused to submit to the jurisdiction of the Michigan court, and she has failed to turn herself in to federal authorities on the indictment for kidnapping. Therefore, mother is, constructively speaking, a fugitive from justice for purposes of applying the doctrine.

However, any nexus between mother's status as a fugitive and the current appeal is tenuous. To begin with, and contrary to father's assertion in his motion to dismiss, mother's status as a fugitive from Michigan's *probate* court has nothing whatsoever to do with her appeal in this Court. Neither does her current appeal relate in any meaningful sense to the indictment taken out against her in the federal system. While it is true that mother would likely not be in a position to have to request registration and enforcement of the 2003 Michigan decree absent her status as a fugitive from the Michigan court, mother's request to register the 2003 Michigan decree in Virginia resulted, not from mother's actions, but from father's actions in taking J.M. from Austria and bringing her to Virginia. It appears mother's appeal is, thus, a direct result of father's actions, rather than mother's refusal to submit to the jurisdiction of the Michigan courts. Indeed, we are mindful that mother is a fugitive on a bench warrant issued against her in *Michigan*; she is not a fugitive from any judgment entered against her in this Commonwealth. Such a nexus may be "too slim a reed to support so weighty a doctrine," since it is "not connected in the classic sense of being part of the *same* criminal [or civil] proceeding as to which" mother is a defendant. Walsh, 221 F.3d at 215 (emphasis added); see also Lazaridis v. Wehmer, 288 Fed. Appx. 800, 802-03 (3d Cir. 2008) (holding "that the District Court [in Delaware] erred in relying on the fugitive disentitlement doctrine to dismiss [Lazaridis's] complaint" in part because "although Lazaridis's alleged fugitive status may be an affront to the dignity of the Michigan courts, it is not an affront to this Court or to the District Court").

- 8 -

Even if there is a sufficient nexus between mother's appeal and her status as a fugitive, application of the doctrine is not necessary in this case to effectuate the policy concerns underlying the doctrine. While "[a]n appreciation of the pragmatic concerns" governing the fugitive disentitlement analysis "requires a case-by-case analysis," Walsh, 221 F.3d at 215, cases involving custody are "in an entirely different category than other issues for fugitive disentitlement purposes," Matsumoto, 792 A.2d at 1235. In cases involving child custody "'the best interests of the child are paramount and form the lodestar for the guidance of the court in determining the dispute.'" Bailes v. Sours, 231 Va. 96, 99, 340 S.E.2d 824, 826 (1986) (quoting Walker v. Brooks, 203 Va. 417, 421, 124 S.E.2d 195, 198 (1962)). In fact, "[p]arenthood is one of the greatest joys and privileges of life, and, under the Constitution, parents have a fundamental interest in their relationships with their children." Walsh, 221 F.3d at 216 (citing Troxel v. Granville, 530 U.S. 57 (2000)). Thus, "[t]o bar a parent who has lost a child from even arguing that the child was wrongfully removed to another country is too harsh. It is too harsh particularly in the absence of any showing that the fugitive status has impaired the rights of the other parent." Id. This is not to say the doctrine would *never* be applicable in child custody cases; it is simply to say the doctrine should be used in such cases only sparingly and where there is no significant negative impact on the best interests of any children.[4]

Additionally, none of the other articulated policy concerns giving rise to the application of the fugitive disentitlement doctrine appear to be present here. As to any prejudice to father, we first note that "[p]rejudice may take many forms." Id. at 216 n.9. For example, prejudice to one's opponent may occur in cases in which the fugitive refuses to submit to discovery. Id.

---

[4] We recognize that this is not a child custody case in the classic sense, in that mother is merely seeking registration of the 2003 Michigan decree rather than a determination on the custody of J.M. We, nevertheless, believe the underlying policy considerations pertaining to custody are relevant to the applicability of the fugitive disentitlement doctrine in this case.

Prejudice may also occur in cases in which the fugitive refuses to pay costs, or in cases in which the plaintiff's fugitive status results in the mere harassment of his adversaries, or even in cases in which "the plaintiff's fugitive status places him entirely beyond judicial control." Sarlund v. Anderson, 205 F.3d 973, 975 (7th Cir. 2000). None of these scenarios are implicated in the instant case. First of all, mother's appeal does not involve civil litigation or implicate the merits of an actual lawsuit; it merely addresses the question of whether Virginia should afford full faith and credit to the 2003 Michigan decree. No discovery will be propounded, and no trial will occur. Moreover, mother will be responsible only for costs associated with her appeal, and mother's status as a fugitive would not place her entirely beyond the control of our judiciary. More importantly, father, and not mother, currently has physical custody of J.M. in Virginia. Father also has temporary legal custody of J.M. under the 2008 Michigan custody modification order. Thus, father has failed to show that mother's status as a fugitive has impaired his rights. There is simply no prejudice to father in allowing mother's appeal in this Court to proceed.

There is also no reason to believe that our refusal to dismiss this case under the fugitive disentitlement doctrine will result in any delay to father's case. Father prevailed in the circuit court, and it does not appear that he has filed for custody in the Commonwealth. We will not impose such a severe sanction merely because our refusal to apply the doctrine may theoretically result in frustrating father's battle for custody of J.M.

Finally, the fugitive disentitlement doctrine is not applicable in cases such as this one, where "no enforcement issue exists." Matsumoto, 792 A.2d at 1236. Again, this case does not involve a custody determination, which necessarily invokes the enforcement powers of the court. Rather, mother's appeal requires the application of full faith and credit to a prior custody order entered by a sister state. Also, because father, and not the fugitive mother, currently has custody of J.M., no prejudice results from this Court's unwillingness to exercise the fugitive

- 10 -

disentitlement doctrine.  See, e.g., id. ("To be sure, like courts in other jurisdictions, we would

impose the doctrine in a case in which the fugitive parent has removed or hidden the child,

thereby making enforcement [of the court's custody order] improbable in the event of a decision

unfavorable to the fugitive parent.").

In sum, we find that application of the fugitive disentitlement doctrine is not appropriate

in this case and we, therefore, deny father's request to dismiss mother's appeal.

B.  Whether the trial court erred in refusing to register the 2003 Michigan decree

Mother alleges the circuit court's reason for refusing registration and enforcement of the

2003 Michigan decree is not a valid reason for refusal under the UCCJEA.  She, thus, maintains

the circuit court abused its discretion in refusing to register the decree.

The UCCJEA is comprised of four articles.  "Article 1 sets forth definitions and other

general provisions.  Article 2 defines the circumstances in which the trial court may exercise

jurisdiction concerning child custody determinations.  Article 3 establishes the procedures for the

[registration and] enforcement of child custody determinations[, and] Article 4 consists of

miscellaneous provisions."  Tyszcenko v. Donatelli, 53 Va. App. 209, 218, 670 S.E.2d 49, 54

(2008).  Article 3 of the UCCJEA "'requires the courts of this Commonwealth to "recognize and

enforce" appropriate child custody determinations of the courts of other states.'"  Prashad v.

Copeland, 55 Va. App. 247, 260, 685 S.E.2d 199, 205 (2009) (quoting Tyszcenko, 53 Va. App.

at 218, 670 S.E.2d at 54).  To that end, Code § 20-146.24 provides,

> A court of this Commonwealth *shall* recognize and enforce a child
> custody determination of a court of another state if the latter court
> exercised jurisdiction in substantial conformity with this act or the
> determination was made under factual circumstances meeting the
> jurisdictional standards of this act and the determination *has not
> been modified* in accordance with this act.

Code § 20-146.24(A) (emphases added).  "The first step in the recognition and enforcement of a

foreign child custody determination is registering that order with 'the appropriate juvenile and

- 11 -

domestic relations district court in this Commonwealth.'" Prashad, 55 Va. App. at 260, 685 S.E.2d at 205-06 (quoting Code § 20-146.26(A)).[5] Upon receipt of the required documents, "the registering court *shall* [c]ause the determination to be filed as a foreign judgment." Code § 20-146.26(B)(1) (emphasis added). "[D]uring registration, 'the scope of the enforcing court's inquiry is limited to the issue of whether the decree[ing] court had jurisdiction and complied with due process in rendering the original custody decree. No further inquiry is necessary . . . .'" Prashad, 55 Va. App. at 261, 685 S.E.2d at 206 (quoting UCCJEA Prefatory Note, 9 U.L.A. 649, 653 (1997)). Upon registration, the court "*shall* recognize and enforce" the "registered child custody determination." Code § 20-146.27(B) (emphasis added).

In the instant case, the parties agree that the Michigan court had jurisdiction and that it complied with due process in rendering the 2003 Michigan decree. Thus, "unless some other statutory or constitutional provisions dictate otherwise," the circuit court was required to register and enforce the order. See Prashad, 55 Va. App. at 261, 685 S.E.2d at 206. Father suggests the circuit court could refuse to register the order under what he refers to as the "clean hands"

---

[5] Code § 20-146.26(A) provides:

> A child custody determination issued by a court of another state may be registered in this Commonwealth, with or without a simultaneous request for enforcement, by sending to the appropriate juvenile and domestic relations district court in this Commonwealth:
>
> 1. A letter or other document requesting registration;
>
> 2. Two copies, including one certified copy, of the determination sought to be registered, and a statement under penalty of perjury that to the best of the knowledge and belief of the person seeking registration the order has not been modified; and
>
> 3. Except as otherwise provided in § 20-146.20, the name and address of the person seeking registration and any parent or person acting as a parent who has been awarded custody or visitation in the child custody determination sought to be registered.

- 12 -

component to the UCCJEA found in Code § 20-146.19. That code section provides in relevant part,

> Except as otherwise provided in § 20-146.15 or by other law of this Commonwealth, if a court of this Commonwealth has jurisdiction under this act because a person seeking to invoke its jurisdiction has engaged in unjustifiable conduct, the court shall decline to exercise its jurisdiction unless:
>
> 1. The parents and all persons acting as parents have acquiesced in the exercise of jurisdiction;
>
> 2. A court of the state otherwise having jurisdiction under §§ 20-146.12, 20-146.13 or § 20-146.14 determines that this Commonwealth is a more appropriate forum under § 20-146.18; or
>
> 3. No court of any other state would have jurisdiction under the criteria specified in subsection B.

Code § 20-146.19(A). Assuming father is correct in his assertion that the circuit court could refuse to exercise its jurisdiction to register the orders for mother's misconduct under Code § 20-146.19(A), we find Code § 20-146.19(A) is not applicable to the facts of this case. Indeed, in the instant case, the circuit court did not "decline to exercise its jurisdiction." Rather, the court exercised its jurisdiction and simply decided not to register the various orders.

The problem in mother's case arises from the fact that the record clearly indicates the 2003 Michigan decree was modified as to visitation by the July 2008 visitation modification order, and as to custody by the 2008 Michigan custody modification order, which awarded father "temporary sole physical and sole legal custody" of J.M. Although the circuit court did not rely on this reason in refusing to register the 2003 Michigan decree, Code § 20-146.24(A) expressly states that the Commonwealth will only recognize and enforce custody determinations of another state "if . . . the determination *has not been modified* in accordance with this act." (Emphasis added.) The 2003 Michigan decree was modified by both the July 2008 visitation modification order and the 2008 Michigan custody modification order. For that reason, the circuit court did not err in refusing to register and enforce the 2003 Michigan decree. "'We do not hesitate, in a

- 13 -

proper case, where the correct conclusion has been reached but the wrong reason given, to sustain the result and assign the right ground.'" Harrison & Bates, Inc. v. Featherstone Assocs. Ltd. Pshp., 253 Va. 364, 369, 484 S.E.2d 883, 886 (1997) (quoting Robbins v. Grimes, 211 Va. 97, 100, 175 S.E.2d 246, 248 (1970)).

### III.  Conclusion

For the foregoing reasons, we deny father's request to dismiss this case under the fugitive disentitlement doctrine, since that doctrine is not applicable to the facts presented here.  On the merits, however, although we agree with mother that the circuit court's reason for refusing to register the 2003 Michigan decree based upon mother's misconduct was erroneous, we affirm the circuit court's refusal to register and enforce the 2003 Michigan decree because the decree was subsequently modified in 2008.

Affirmed.